ESTATE OF ETTA HIMMELSTEIN, SHIRLEYANN HAVESON AND
MARY H. DIAMOND, COEXECUTRICES, PETITIONERS V.
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9082–78.   Filed February 25, 1980.

*Robert R. Ross,* for the petitioners.
*William F. Halley* and *Bernard S. Mark,* for the respondent.

## OPINION

NIMS, *Judge:* Respondent determined a deficiency in petitioners' estate taxes in the amount of $94,796.44.

Concessions having been made, the remaining issue for decision is whether assets owned by an incompetent which, pursuant to a State court order, were transferred within 3 years of her death are includable in her gross estate as transfers made in contemplation of death.

All of the facts have been stipulated. The stipulation, together with the exhibits attached thereto, are incorporated herein by this reference.

At the time of the filing of their petition, Shirleyann Haveson and Mary H. Diamond (hereinafter referred to as petitioners), the coexecutrices of the Estate of Etta Himmelstein, resided at 908 Gainsway Ave., Yardley, Pa. The decedent's will was admitted to probate in the Surrogate's Court, Mercer County, N.J. Petitioners filed a U.S. estate tax return on behalf of Etta Himmelstein (hereinafter referred to as decedent) on September 2, 1975.

Decedent was born on August 25, 1896. On or about July 1, 1970, she suffered a stroke which required her hospitalization. On December 29, 1970, decedent entered the Meadow Lakes Extended Care Facility (Meadow Lakes) in Hightstown, N.J., for stroke rehabilitation. At the time, decedent was suffering from

arteriosclerotic heart disease, general arteriosclerosis, and chronic brain syndrome due to cerebral arteriosclerosis. During her stay at Meadow Lakes, decedent was under constant medical supervision and nursing care.

On January 22, 1971, decedent was adjudged a mental incompetent by an order of the Mercer County Surrogate's Court of the State of New Jersey. Pursuant to that order, the petitioners were appointed her guardians.

Petitioner Mary H. Diamond was decedent's only child and was a one-third beneficiary under decedent's will. Petitioner Shirleyann Haveson was decedent's only granddaughter and was a two-thirds residuary beneficiary under decedent's will.

On May 11, 1972, petitioners instituted an action in the Superior Court of New Jersey, Chancery Division. In this action, petitioners sought a judgment permitting them, as decedent's guardians, to effect gratuitous transfers of a portion of decedent's assets to themselves. The amounts of the requested gifts were current distributions of $60,000 to petitioner Mary Diamond and $120,000 to petitioner Shirleyann Haveson, plus subsequent annual gifts of $3,000 to each. To avoid any potential conflicts of interest between petitioners' respective roles as decedent's guardians and as plaintiffs in the above-mentioned action, the Superior Court appointed George Warren, Esquire, as guardian ad litem for the decedent.

In above action, the petitioners alleged that if decedent were competent she would have continued to show her love and affection for them by continuing the pattern of gift giving decedent had previously demonstrated. However, an additional consideration for the requested transfers was the substantial savings in estate taxes which would result. Thus, for example, in the Verified Complaint for Instructions filed with the Superior Court, petitioners alleged that:

10. Plaintiffs believe that although Etta Himmelstein would be primarily motivated, were she competent, to continue her gift giving for reasons of love and affection, she would be secondarily and incidentally motivated to continue such gift giving for reasons of prudent estate planning. Because of its size, Etta Himmelstein's estate will be in a 31% Federal Estate Tax bracket and 7% New Jersey Transfer Inheritance Tax bracket.

\* \* \* \* \* \* \*

13. Plaintiffs are of the opinion that if Etta Himmelstein were competent, she would make a gift of $60,000 to Mary H. Diamond and $120,000 to Shirleyann Haveson and would thereafter make annual gifts of $3,000 to each

of the plaintiffs. If said gift of $180,000 is made in 1972, the United States Gift Tax would be approximately $25,000. However, if the assets remain in Etta Himmelstein's estate, the Federal Estate Tax and New Jersey Transfer Inheritance Tax will be approximately $68,000.

Decedent had not made any gifts to the petitioners prior to the ones in issue.[1]

At the time the petitioners instituted this action, decedent was 76 years old. Doctor David Eckstein, the physician who had been in charge of decedent since her admission to Meadow Lakes, had stated that decedent's condition (commonly known as advanced senility) was irreversible and progressive, with recovery being medically impossible. According to the Verified Complaint for Instructions, decedent's then-present life expectancy under the 1958 Commissioner's Standard Ordinary Mortality Tables was 8 years. However, the guardian ad litem, in his report to the Superior Court, stated: "Inquiry of the physician in charge of this incompetent elicited the information that her physical condition is deteriorating and in his opinion she will not survive for the period anticipated by the expectancy tables."

On June 16, 1972, the Superior Court authorized the transfers from the decedent to petitioners and found that:

(1) The mental and physical condition of the incompetent are such that the possibility of her restoration to competency is virtually non-existent; (2) The assets of the estate of the incompetent remaining after the consummation of the proposed gifts are such that, in light of her life expectancy and her present condition of health, they are more than adequate to meet all of her needs in the style and comfort in which she now is and since onset of her incompetency has been maintained, giving due consideration to all normal contingencies; (3) The donees constitute the natural objects of the bounty of the incompetent by any standard—not only do they compose the sole existing primary descendants of the incompetent, but at this moment if they survive, they are in fact the only beneficiaries who will share under the Will of the incompetent; (4) The transfer will benefit and advantage the estate of the incompetent by a reduction of death taxes; (5) There is. no substantial evidence that the incompetent, as a reasonably prudent person, if competent, would not make the gifts proposed in order to effectuate a saving of death taxes.

---

[1]The Verified Complaint for Instructions alluded to a "continual and constant pattern of gift giving" to the petitioners by both decedent and her husband. In particular, the complaint alleged that Mary Diamond received gifts of $4,000 and $2,496 for the respective years 1969 and 1970, and that Shirley Haveson received gifts of $1,000, $10,000, and $4,426 for the respective years 1968, 1969, and 1970. These purported joint gifts were cited as a manifestation of the extraordinary love and affection decedent and her husband had shown for their only daughter and granddaughter. However, the gifts referred to in the complaint were, in fact, made by decedent's husband but had been erroneously reported as joint gifts.

Pursuant to the Superior Court's order to transfer sum, the following transfers were made by petitioners as decedent's guardians:

| Date of gift | Donee | Amount |
|---|---|---|
| 7/7/72 ................. | Mary H. Diamond ................ | $60,000 |
| 7/7/72 ................. | Shirleyann Haveson ............. | 60,000 |
| 7/25/72. ................ | Shirleyann Haveson ............. | 60,000 |
| 1/1/73 ................. | Mary H. Diamond ................ | 3,000 |
| 1/1/73 ................. | Shirleyann Haveson ............. | 3,000 |
| 1/1/74 ................. | Mary H. Diamond ................ | 3,000 |
| 1/1/74 ................. | Shirleyann Haveson ............. | 3,000 |

On November 29, 1974, the decedent died. The cause of her death was "arterio sclerotic heart disease—senile dimentia."

The issue for decision is whether the court-ordered gifts of the decedent's property are includable in her gross estate under section 2035[2] as transfers made in contemplation of death.

Section 2035(b) creates the rebuttable presumption that transfers occurring within 3 years of the decedent's death were made in contemplation thereof. In order to prevail on this issue, petitioners are required to prove that decedent's dominant motive for making the transfers centered on a life purpose and not the thought of impending death.[3] *United States v. Wells,* 283 U.S. 102 (1931); *Estate of Gerard v. Comissioner,* 57 T.C. 749 (1972), affd. per curiam 513 F.2d 1232 (2d Cir. 1975).

Normally, resolution of whether or not transfers were made in contemplation of death involves a factual determination. *Estate of Ford v. Commissioner,* 53 T.C. 114 (1969), affd. per curiam 450 F.2d 878 (2d Cir. 1971). However, the fact that the decedent was an adjudicated incompetent at the time the transfers were made presents an additional conceptual hurdle. Petitioners have noted that an incompetent is generally considered a nonperson in law, incapable of forming any intent. Such being the case, it is urged that the transfers at issue were not made in contemplation of death since the decedent could not, by definition, have any motive with respect to the gifts. Although petitioners' argument

---

[2]All statutory references are to the Internal Revenue Code of 1954, as in effect during the year in issue, except as otherwise expressly indicated.

[3]Sec. 2035 was subsequently amended by the Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1520, 1848. For estates of decedents dying after Dec. 31, 1976, any property transferred by gift within 3 years of death is includable in the gross estate without regard to the decedent's underlying motive for the gift.

has superficial appeal, we must, for reasons stated below, reject it.

The issue of whether gratuitous transfers of an incompetent's property could constitute gifts made in contemplation of death was considered by the Supreme Court in *City Bank Farmers Trust Co. v. McGowan*, 323 U.S. 594 (1945). In that case, a committee had been appointed by the Supreme Court of the State of New York to care for the property of an adjudicated incompetent. A daughter petitioned the court to provide for allowances for herself and other relatives from the incompetent's surplus income. The court approved the petition and directed the committee to make the requested transfers finding that the incompetent would have made such allowances if she had been in possession of her mental faculties. Upon a subsequent application, the amounts of the allowances were increased after the court made a similar finding that the incompetent, if sane, would have desired that the sums provided for in the earlier decree be increased. After the incompetent died, respondent included the previously paid allowances in her gross estate under the predecessor of section 2035. The Supreme Court, in holding that a portion of the allowances were includable in the decedent's gross estate, stated:

> The issue is a narrow one. Literally Mrs. Vail neither made the transfers nor did she have any motive with respect to them. But a court stood in her place and unquestionably had the function of effectuating a transfer of her property and of determining what motive or purpose would have actuated her had she been competent to act. It seems to us that it is sticking in the bark to say that, in the circumstances, the transfers are not within the section because Congress did not add a phrase to the effect that where a court made the transfer, acting in lieu of the incompetent owner, such a transfer should be governed by the statute.
>
> We hold, therefore, that where, as in New York, the court is to substitute itself as nearly as may be for the incompetent, and to act upon the same motives and considerations as would have moved her, the transfer is, in legal effect, her act and the motive is hers. [*City Bank Farmers Trust Co. v. McGowan, supra* at 598–599.]

Petitioners argue that the holding in *City Bank Farmers Trust Co.* is a narrow one, confined to its unique facts. Specifically, petitioners emphasize that the standard which governed the authority of the New York courts to provide for gratuitous transfers of an incompetent's assets was subjective. That is, the court was first to determine how the incompetent

would have acted if sane, and then act essentially as his alter ego. Limited to those facts, petitioners contend that the instant case is not within the purview of *City Bank Farmers Trust Co.* because the relevant law of New Jersey was couched in terms of an objective standard, that of a reasonable and prudent man. Since the New Jersey rule is not substantively identical to the standard which was before the Supreme Court in *City Bank Farmers Trust Co.*, petitioners conclude that they must prevail on the theory that incompetents are incapable of possessing the requisite state of mind (contemplation of death) for purposes of section 2035.[4]

The body of law dealing with judicial control over the property of an incompetent, sometimes referred to as the "Doctrine of Substituted Judgment," had its origins in England with the case of *Ex parte Whitbread*, 2 Mer. 99, 35 Eng. Rep. 878 (1816). Under the rule in that case, a court is authorized to apply the incompetent's property "in such manner as the court thinks it would have been wise and prudent in the Lunatic himself to apply it, in case he had been capable." *Ex parte Whitbread*, 2 Mer. at 103, 35 Eng. Rep. at 879. Although a full discussion regarding the evolution of the doctrine is beyond the scope of this opinion, an analysis of *In re Trott*, 118 N.J. Super. 436, 288 A.2d 303 (Super. Ct. Ch. Div. 1972), and *In re Guardianship of Christiansen*, 248 Cal. App. 2d 398, 56 Cal Rptr. 505 (1st Dist. Ct. App. 1967), is essential for purposes of our decision.

The *Trott* case was cited by decedent's guardian ad litem in his report to the New Jersey Superior Court. The report, in recommending approval of the proposed transfers, noted that the *Trott* case and decedent's situation presented factual patterns which were virtually identical.

In *Trott*, an incompetent's guardian sought approval of a plan which provided for lump-sum distributions of principal as well as subsequent annual gifts of $3,000 to the incompetent's four next-of-kin. The court approved the reasoning of the California District Court of Appeal in *Christiansen* and, accordingly, subscribed to the following rule:

---

[4] Although it is arguable that New York was moving away from a purely subjective standard at the time the facts in *City Bank Farmers Trust Co.* arose, see J. Edelman, "The Development of the 'Substituted Judgment' Rule and its Application In New York As a Vehicle For Estate Planning For Incompetents," 33 Alb. L. Rev. 597 (1969), for present purposes we will accept petitioners' interpretation of then-existing New York law.

It is concluded that the courts of this state, in probate proceedings for the administration of the estates of insane or incompetent persons, have power and authority to determine whether to authorize transfers of the property of the incompetent for the purpose of avoiding unnecessary estate or inheritance taxes or expenses of administration, and to authorize such action where it appears from all the circumstances that the ward, if sane, as a reasonably prudent man, would so plan his estate, there being no substantial evidence of a contrary intent. [56 Cal. Rptr. at 522–523; *In re Trott,* 288 A.2d at 306.]

In authorizing the transfers, the Court was satisfied that:

(1) the mental and physical condition of the incompetent are such that the possibility of her restoration to competency is virtually nonexistent; (2) the assets of the estate of the incompetent remaining after the consummation of the proposed gifts are such that, in the light of her life expectancy and her present condition of health, they are more than adequate to meet all of her needs in the style and comfort in which she now is (and since the onset of her incompetency has been) maintained, giving due consideration to all normal contingencies; (3) the donees constitute the natural objects of the bounty of the incompetent by any standard—not only do they compose her sole existing primary descendants, but at this moment, if they survive, they are in fact the only beneficiaries who will share under her will (two of them having been specifically designated, and the other two succeeding to the interest of their deceased mother, the designated beneficiary of the remaining one-half); (4) the transfer will benefit and advantage the estate of the incompetent by a reduction of death taxes; (5) there is no substantial evidence that the incompetent, as a reasonably prudent person, would, if competent, not make the gifts proposed in order to effectuate a saving of death taxes. [*In re Trott,* 288 A.2d at 307; fn. refs. omitted.]

The above factors, taken from *Christiansen,* were recited almost verbatim by the New Jersey Superior Court in its order authorizing the transfer of decedent's property.

In *Christiansen,* the California Court of Appeal, First District, undertook an exhaustive analysis of the substituted judgment doctrine. One of the considerations before the court was the appropriate standard for determining whether transfers of an incompetent's property should be authorized. In rejecting a purely subjective standard, the court noted that if such a standard were controlling, in many situations transfers of the incompetent's property could never be authorized. For example, where there had been a long period of incompetency and evidence of the incompetent's prior behavior was lacking, authorization for the transfers would be denied. The same result would be required if the onset of insanity had been gradual, since it would be impossible to determine what behavior pattern actually was a manifestation of the incompetent's "sane" intent.

In those instances, a court constrained by a subjective test would have no viable means of ascertaining what the particular incompetent would have done. "It is generally concluded that those cases which interpret *Ex parte Whitbread* (1816) 2 Mer. 99, 35 Eng. Rep. 878, as requiring evidence of past conduct or practice have given the principle enunciated too narrow a construction." (*In re Christiansen*, 56 Cal. Rptr. at 520.) Accordingly, the court stated:

> Whether termed a liberal subjective rule or an objective rule tempered and supplemented by evidence of the incompetent's former practices and conduct, the commentators are practically all in agreement that, as suggested seventy years ago (see fn 13, *supra*), the guardian should be authorized to act as a reasonable and prudent man would act under the same circumstances, unless there is evidence of any settled intention of the incompetent, formed while sane, to the contrary. [*In re Christiansen*, 56 Cal. Rptr. at 521.]

Petitioners are correct in their characterization of the *Christiansen-Trott* rule as one that is not purely subjective. In the absence of evidence evincing an intent that is contrary to what a reasonable man would do, *Christiansen* and *Trott* set forth an objective standard. This does not, however, require a result different from that of *City Bank Farmers Trust Co*. We believe that the New Jersey standard, which authorized the transfers here at issue, falls within the purview of *City Bank Farmers Trust Co*. since the New Jersey Superior Court was required "to substitute itself as nearly as may be for the incompetent, and to act upon the same motives and considerations as would have moved her." *City Bank Farmers Trust Co. v. McGowan, supra*. It may be true that the Supreme Court couched its language in terms of what the incompetent herself might have done. Nevertheless, to argue as petitioners do that section 2035 is avoided by the substitution of the prudent man rule for the "what-the-incompetent-might-have-done" rule is to sanctify a distinction without a difference. Thus, it is in no way unreasonable to have the actions authorized by the Superior Court imputed to decedent.

The *Christiansen* court, in fashioning its "liberal subjective" test, recognized that in the absence of a workable rule it would be impossible for a court to exercise its judgment in substitution for the incompetent where the individual had been mentally incapacitated for a prolonged period, or from birth, or when there were no prior manifestations of his intent.

The problem is not one of absolutes, but one of weighing many factors, hereinafter pointed out, in order to determine the proper course for the particular incompetent's estate. So long as the action authorized serves the basic aims which can be attributed to the incompetent, neither he nor others should be in a position to subsequently complain. [*In re Christiansen*, 56 Cal. Rptr. at 522.]

The Supreme Court, in *City Bank Farmers Trust Co.*, was certainly cognizant of the tremendous potential for estate tax avoidance which would have been possible had a rule making incompetents incapable of contemplation-of-death transfers been adopted. Guardians seeking authorization for deathbed transfers would have gained a powerful argument in favor of lifetime transfers by incompetents by merely demonstrating the substantial savings in estate taxes. Indeed, the major rationale in support of the substituted judgment doctrine is that substantial savings in estate taxes may be effected by lifetime transfers of an incompetent's property.[5] Thus, the *Christiansen* court noted:

To refuse to permit the management of the incompetent's estate in the manner that a reasonable and prudent man would manage his estate may, in many cases, lead to the improbable conclusion that it was the intent of the incompetent to enrich the taxing authorities rather than the natural or declared objects of his bounty. [*In re Christiansen, supra* at 522.]

We reject petitioners' contention that the result here should hinge on the label attached to the standard governing the authority of the New Jersey courts to transfer an incompetent's property. Accordingly, we hold that the transfers authorized by the New Jersey Superior Court were, for purposes of section 2035, those of the decedent and the considerations which motivated the court in making its determination are to be imputed to the decedent.

Our decision that the transfers, as well as the factors considered by the New Jersey court, are imputed to the decedent does not automatically result in inclusion under section 2035. In addition, we must determine whether the evidence presented

---

[5]*In re Carson*, 39 Misc. 2d 544, 241 N.Y.S.2d 288 (Ulster County Sup. Ct. 1962); *In re duPont*, 41 Del. Ch. 300, 194 A.2d 309 (1963); *In re Christiansen*, 248 Cal. App. 2d 398, 56 Cal. Rptr. 505 (1st Dist. Ct. App. 1967). Prior to the enactment of the unified rate for gift and estate taxes by the Tax Reform Act of 1976, there was a substantial tax motivation to effect inter vivos transfers of an incompetent's property because of the disparity between the respective progressive rates of the gift and estate taxes. This assumes that the gifts would be beyond the 3-year period of sec. 2035. Of course, tax savings as to gifts made within the 3-year period is the issue before us in this case.

demonstrates that the transfers were not made in contemplation of death.

Section 2035 creates a rebuttable presumption that any transfer made by a decedent within the 3-year period preceding the date of decedent's death is made in contemplation thereof. We believe that petitioners have failed to satisfy their burden of proving that the transfers were not made in contemplation of death. Indeed, the record provides ample support for a contrary interpretation. Upon review of the entire record, we conclude that the following factors demonstrate death motives for the transfers: the decendent's poor health; the donees were decedent's daughter and granddaughter—the natural objects of her bounty; the gifts were in a manner consistent with decedent's will; and the manifest objective of avoiding estates taxes.[6]

Here, the decedent was 76 years old and in failing health at the time of the first transfer. She was suffering from advanced senility and required constant medical supervision and nursing care. The evidence demonstrates awareness of decedent's deteriorating physical condition. Age and health clearly are important factors to be considered in determining the dominant motive for the transfer. *Estate of Gerard ·v. Commissioner*, 57 T.C. 749 (1972), affd. per curiam 513 F.2d 1232 (2d Cir. 1975).

Another factor evidencing a death motivation is the relationship of the donees to the decedent. They are the decedent's only child and only grandchild, the natural objects of her bounty and also the residuary beneficiaries under her will. Further, the gifts were made in the same respective proportions as decedent provided for in her will. These factors impute strong testamentary intent. *Estate of Hite v. Commissioner*, 49 T.C. 580 (1968); *Estate of Gerard v. Commissioner, supra.*

The most significant indicator of the decedent's death motive is found by reference to the proceedings before the New Jersey Superior Court. In the Verified Complaint for Instructions, the petitioners allude to a $43,000 savings in estate taxes. In approving the transfers, the New Jersey Superior Court found that: "There is no substantial evidence that the incompetent, as a reasonably prudent person, if competent, would not make the gifts proposed in order to effectuate a saving of death taxes."

---

[6]Factors relevant in determining the dominant motive of a decedent in making an inter vivos transfer of property are listed, for example, in *Estate of Johnson v. Commissioner*, 10 T.C. 680 (1948).

Such expected reduction of estate taxes bears heavily against any possible life-motivated interpretation. *Estate of Johnson v. Commissioner*, 10 T.C. 680 (1948).

We hold that the transfers in issue were constructively made by the decedent, in contemplation of death, within the meaning of section 2035.

*Decision will be entered under Rule 155.*