ESTATE OF MARIA BIANCHI, PETER BIANCHI, EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Bianchi v. Commissioner
Docket No. 4627-78.
United States Tax Court
T.C. Memo 1982-389; 1982 Tax Ct. Memo LEXIS 356; 44 T.C.M. (CCH) 422; T.C.M. (RIA) 82389; July 13, 1982. L.G. von Schottenstein, for the petitioner. J. Michael Chitwood, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in Federal estate tax for the estate of Maria Bianchi, Peter Bianchi, executor, in the amount of $173,903. The issues for decision are as follows: (1) Whether all or any part of two farm properties which decedent transferred in return for private annuities are includable in her gross estate under section 2036[1] because decedent retained for her life the possession or enjoyment of, or the right to income from, such properties. *358 (2) Whether amounts owed to decedent under annuity agreements which decedent forgave within the three-year period prior to her death constituted transfers in contemplation of death. (3) Whether certain cash gifts decedent made to her children within the three-year period prior to her death were transfers in contemplation of death. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Peter Bianchi, executor of the estate of Maria Bianchi, filed a timely Federal estate tax return for decedent's estate with the Internal Revenue Service Center, Fresno, California. At the time the petition was filed in this case, Peter Bianchi resided in Santa Rosa, California. Maria Bianchi died testate on February 14, 1974, in Sebastapol, California, at the age of 94. At the time of her death, decedent was survived by her five children: John Bianchi, Elsie Titus, Peter Bianchi, Philip Bianchi, and Amelia Lombella. Maria Bianchi was the widow of Pietro Bianchi who died on July 2, 1956. For many years prior to Pietro Bianchi's death, he and Maria Bianchi operated a dairy farm business on two parcels of real property which they owned in joint tenancy. These *359 two parcels of real property are the subject of dispute in the present case. The first parcel of property, known as the Bianchi Home Ranch, is comprised of approximately 642 acres. The personal residence of Pietro and Maria Bianchi was also located on the Bianchi Home Ranch. The second parcel of property is known as the LeBaron-Norbell Farm and is comprised of approximately 262 acres. In September 1949, Pietro and Maria Bianchi retired from dairy farming. At that time they entered into a lease with their son, John Bianchi, and his wife, Helen, renting to them the Bianchi Home Ranch, except for the personal residence, for dairy farming purposes. The lease was for a five-year period at a yearly rental of $3,200. The lease also provided for an option to renew the lease for an additional five-year period at the same rent and under the same terms and conditions. Concurrent with the lease of the Bianchi Home Ranch, Pietro and Maria Bianchi sold the bulk of the working assets of their dairy farming operation to John and Helen Bianchi. In September 1949, Pietro and Maria Bianchi leased the property known as the LeBaron-Norbell Farm to their daughter, Elsie Titus, and her husband, *360 Ross Titus, for dairy farming purposes. The lease was for a five-year period and called for a yearly rental of $1,400. The lease contained a provision granting an option to renew the lease for an additional five-year period at the same rent and under the same terms and conditions. Before the expiration of their respective leases, John and Helen Bianchi and Elsie and Ross Titus exercised their renewal options. During the period from August 1954 until September 1959, John and Helen Bianchi continued to hold and farm the Bianchi Home Ranch, except for the personal residence of Pietro and Maria Bianchi, as lessees, and to pay a yearly rent in the amount of $3,200. During this same period, Elsie and Ross Titus continued to hold and farm the LeBaron-Norbell Farm as lessees, and to pay yearly rent of $1,400. Pietro Bianchi died in July 1956. Maria Bianchi, as a result of his death, became the sole owner of the Bianchi Home Ranch and the LeBaron-Norbell Farm. Maria Bianchi continued to live in and maintain the house on the Bianchi Home Ranch as her personal residence. Maria Bianchi continued to lease the two properties, renewing for five-year periods the lease agreements she and *361 her deceased husband had previously entered into, respectively, with John and Helen Bianchi and Elsie and Ross Titus. Each of the respective leases was renewed in September 1959 and again in September 1964, and at each renewal the yearly rental payments remained the same. In September 1969, Maria Bianchi renewed both lease arrangements for a five-year period ending in August 1974. However, the lease renewal for the Bianchi Home Ranch called for an increase in the yearly rental to $4,500 while the lease renewal for the LeBaron-Norbell Farm called for an increase in the yearly rental to $2,000. During the period from September 1949 through March 2, 1970, John and Helen Bianchi and Elsie and Ross Titus constructed various buildings and improvements on their respective leased properties. From time to time Pietro and Maria Bianchi, and later Maria Bianchi alone when she became sole owner of the properties, would execute agreements which provided that the buildings and improvements erected would remain the property of the tenants and that, upon the termination of each respective lease, the tenants would have the right to remove the structures from the premises. Prior to Pietro *362 Bianchi's death, both he and Maria Bianchi desired that the Bianchi Home Ranch be left to their son, John Bianchi, and that the LeBaron-Norbell Farm be left to their daughter, Elsie Titus. Pietro and Maria Bianchi in 1952 had executed reciprocal wills which had so provided. The April 7, 1952, will which Maria Bianchi executed provided that all of her estate was to got o her husband, Pietro Bianchi. However, in the event Mr. Bianchi did not survive her, the will alternatively provided as follows: (1) The Bianchi Home Ranch was to be given to her son, John Bianchi; (2) The LeBaron-Norbell Farm was to be given to her daughter, Elsie Titus; (3) Cash gifts of $150 were to be given to each of her specifically named grandchildren; and (4) The residue of the estate was to be divided in equal shares and given to her other three children, Peter Bianchi, Philip Bianchi, and Amelia Lombella. Charles DeMeo since 1949 had been the attorney for Pietro and Maria Bianchi. Mr. DeMeo drew up the original lease agreements under which the Bianchis leased the two farm properties to John and Helen Bianchi and to Elsie and Ross Titus. He had also drawn up almost all of the renewal agreements. *363 Mr. DeMeo had also been the attorney who handled the probate of Pietro Bianchi's estate. After Pietro Bianchi's death, Maria Bianchi informed Mr. DeMeo that it was still her intention to carry out her late husband's wishes and leave the respective farm properties to John Bianchi and Elsie Titus. Since the time of her husband's death, Maria Bianchi had a large amount of money which she kept in one bank account. In March of 1970, the money she had in this account amounted to approximately $180,000. At the time he handled Pietro Bianchi's estate, Mr. DeMeo advised Maria Bianchi that she should make gifts to her children in order to lessen the estate taxes that would be imposed on her estate. Mr. DeMeo periodically continued to remind Maria Bianchi that estate planning was necessary, but it was only in 1970 that she indicated her willingness to make gifts to her children. However, Mr.DeMeo advised against Mrs. Bianchi's making gifts of the two farm properties to her two children, John Bianchi and Elsie Titus, because of the large amount of gift tax which would have to be paid. In late 1969 or early 1970, a meeting occurred at the Bianchi Home Ranch among John and Helen Bianchi, *364 Elsie and Ross Titus, and an attorney named L.G. von Schottenstein. Mr. von Schottenstein was an attorney specializing in taxation. The Bianchis and the Tituses informed Mr. von Schottenstein that their mother had indicated to them a desire to make a gift of the ranches to them and the four had wanted Mr. von Schottenstein to represent them in such a transaction. At the meeting, Mr. von Schottenstein suggested that it would be more advantageous to have Maria Bianchi instead sell them the ranches in exchange for a private annuity, rather than make gifts to them of the ranches. Pursuant to such discussion, Mr. von Schottenstein inquired and was told that Maria Bianchi was represented by Mr. DeMeo. Mr. von Schottenstein then stated that he would contact Mr. DeMeo to discuss the idea of a private annuity. Within the next several weeks, Mr. von Schottenstein had a meeting with Mr. DeMeo at which he explained his idea of having a private annuity. At that meeting, Mr. DeMeo indicated that he was not very familiar with the use of a private annuity but that he felt that the idea had merit and told Mr. von Schottenstein to go ahead and prepare the necessary documents and that he would *365 discuss the subject with his client, Maria Bianchi. Subsequently, Mr. von Schottenstein prepared drafts of contracts which he forwarded to Mr. DeMeo. Mr. von Schottenstein and Mr. DeMeo subsequently had several discussions over the phone concerning the contracts. On February 2, 1970, Maria Bianchi had a meeting with all five of her children. At that meeting she stated to them that she wanted to turn the two ranches over to John Bianchi and Elsie Titus and to make gifts of money to the other three children. Subsequently, another meeting was held for the purpose of having Mr. von Schottenstein show how annuity contracts would be set up for the transfer of the two ranches. Present at this meeting were Maria Bianchi, John Bianchi, Elsie Titus, Peter Bianchi, and Mr. deMeo. On March 2, 1970, Maria Bianchi entered into a "Contract For The Sale Of Real Property in Exchange For Annuity" with John Bianchi, Helen Bianchi, Paul P. Bianchi, and George D. Bianchi (the latter two individuals are the sons of John and Helen Bianchi). Under the agreement, Maria Bianchi agreed to convey the entire Bianchi Home Ranch to John Helen, Paul P., and George D. Bianchi in return for an annuity for *366 her life in the amount of $16,800 per year. This yearly $16,800 annuity was to be paid in amounts of $400 per month, with the remaining $12,000 balance to be paid in a single lump-sum on or before December 31 of each year. The agreement further stated that the parties agreed that the Bianchi Home Ranch was worth $95,760. Maria Bianchi on that same date simultaneously executed a quitclaim deed conveying the Bianchi Home Ranch to John, Helen, Paul P., and George D. Bianchi as tenants in common. The March 2, 1970, quitclaim deed to the property was recorded in the office of the county clerk of Sonoma County, California, on March 16, 1970. On March 2, 1970, Maria Bianchi also entered into a similar agreement with Elsie Titus, Ross Titus, and Ronald Titus (the son of Elsie and Ross Titus). Under this agreement, Maria Bianchi agreed to convey the LeBaron-Norbell Farm to Elsie, Ross, and Ronald Titus in return for an annuity for her life in the amount of $11,400 per year. This $11,400 annuity was to be paid in amounts of $200 per month, with the remaining $9,000 blance to be paid in a single lump-sum on or before December 31 of each year. The agreement further stated that the *367 parties agreed that the LeBaron-Norbell Farm was worth $62,700. Maria Bianchi simultaneously on that day executed a quitclaim deed conveying the LeBaron-Norbell Farm to Elsie, Ross, and Ronald Titus as tenants in common. This quitclaim deed was subsequently recorded on March 16, 1970, in the office of the county clerk of Sonoma County, California. Mr. von Schottenstein determined the values for each of the properties which had been stated in the annuity agreements described above. Mr. von Schottenstein apparently based the $62,700 value for the LeBaron-Norbell Farm on the value at which that property had been assessed for county property tax purposes in the fiscal year beginning July 1, 1969. The land comprising the farm, excluding improvements, had been appraised at a value of $59,400 for that period. Mr. von Schottenstein did not specifically remember how he had arrived at the value stated for the Bianchi Home Ranch, although he stated he believed that the $95,760 value in the annuity agreement was simply a multiple of the $62,700 value he had placed on the LeBaron-Norbell Farm. Mr. von Schottenstein did not have an appraisal made of the two properties, nor did he investigate *368 what the properties would have sold for on the open market. Mr. DeMeo, who represented Maria Bianchi, accepted the values which had been placed on the two properties by Mr. von Schottenstein. Mr. DeMeo did not bargain over the sales prices contained in the two annuity agreements. Mr. DeMeo did not have an independent appraisal made of the two farm properties, nor did he research what the selling price in the area might be for such properties. Mr. DeMeo at trial stated that he did not question the values proposed by Mr. von Schottenstein since the entire idea for the transactions was estate planning. Mr. DeMeo further stated that he believed his client was adequately protected since this was a close-knit family. Mr. DeMeo added that Maria Bianchi was probably aware that the stated sales prices for the properties were below fair market value, but that she had always wanted to give the properties to John Bianchi and Elsie Titus so that, in this case, the money did not mean anything. As of March 2, 1970, the LeBaron-Norbell Farm, excluding improvements, had a fair market value of at least $115,000. The Bianchi Home Ranch on that same date, excluding improvements, had a fair *369 market value of at least $250,000. On March 2, 1970, Maria Bianchi also executed a new will which revoked her prior April 7, 1952, will. The March 2, 1970, will basically provided that her estate was to be divided in three equal shares and given to Peter Bianchi, Philip Bianchi, and Amelia Lombella. The will further stated that Maria Bianchi was purposely making no provision for her other two children, John Bianchi and Elsie Titus. On her income tax returns for 1970, 1971, 1972, and 1973, Maria Bianchi determined that portions of the amounts she disclosed as received under the annuity agreements represented income to her and she paid income taxes on such portions. For 1970 she disclosed receiving payments of $16,000 under the contract for the Bianchi Home Ranch while for 1971, 1972, and 1973 she disclosed receiving $16,800 in payments in each year under such contract. Under the contract for the Norbell-LeBaron Farm, she disclosed receiving payments of $10,667, $11,133, $11,400, and $11,400, respectively, in 1970, 1971, 1972, and 1973. During the period from March 1, 1970, through February 1, 1974, John Bianchi and his family and Elsie Titus and her family made payment *370 of almost all of the monthly payments called for under the respective annuity agreements they had entered into with Maria Bianchi. As is discussed hereinafter, the annual lump-sum payments were either forgiven or never made. Mr. von Schottenstein, in drafting both of the annuity agreements, made each lump-sum yearly payment an amount equal to the $3,000 gift tax annual exclusion times the number of purchasers involved under each of the respective contracts. Thus, under the contract for the transfer of the Bianchi Home Ranch, since there were four purchasers, John and Helen Bianchi and their two sons, the yearly lump-sum payment to be made was set at $12,000. Similarly, the other contract providing for the transfer of the LeBaron-Norbell Farm to Elsie and Ross Titus and their son, Ronald, called for a $9,000 lump-sum payment on the annuity. The agreements were so drafted to facilitate Maria Bianchi's making a gift of $3,000 per year to each purchaser by forgiving the lump-sum payment due for a future year under the respective agreements. Shortly after the two annuity agreements had been executed, Maria Bianchi made two gifts of cash to two of her other children. These gifts *371 were made by two checks both dated March 16, 1970; one check was payable to Peter Bianchi and the other check was payable to Amelia Lombella, in the respective amounts of $13,000 and $8,000. Apparently, Maria Bianchi also tried to make a cash gift to her other son, Philip Bianchi, but he refused to cash the check and she eventually stopped payment on it. On December 30, 1970, Maria Bianchi forgave both the lump-sum payments due her for that year under the two annuity contracts. On the Federal gift tax return she filed for the year 1970, Maria Bianchi reported the cash gifts of $13,000 and $8,000 which she had respectively made to her son, Peter Bianchi, and her daughter, Amelia Lombella, as well as gifts of $3,000 each to John, Helen, Paul P., and George D. Bianchi, and Elsie, Ross, and Ronald Titus, as a result of the forgiveness of the lump-sum payments due under the two annuity contracts. On the return it was computed that no gift tax was owed since, after applying a $3,000 annual exclusion to reduce the gifts made by her to each donee during the year, the remaining balance of the total amount of gifts for the year was more than offset by the $30,000 specific exemption allowed *372 to her. See sections 2502, 2503(a) and (b), and 2521. The return stated that no gift tax returns had been filed by her for prior years and that no amounts had been previously claimed and allowed as a specific exemption in computing the gift tax due for any prior periods. During the period from March 2, 1970, until January 13, 1972, when she entered a hospital, Maria Bianchi lived in and maintained the house on the Bianchi Home Ranch as her personal residence. On January 13, 1972, Maria Bianchi was admitted to the Palm Drive Hospital in Sebastapol, California. On January 17, 1972, she was transferred to the Gravenstein Convalescent Hospital in Sebastapol, where she remained until her death on February 14, 1974. At the time the annuity transactions were entered into, there had been no express discussions concerning whether Maria Bianchi would continue to stay in the house she maintained as her personal residence on the Bianchi Home Ranch. However, she continued to live in and use the home in the same fashion as she had prior to entering the annuity agreements. Maria Bianchi maintained her own garden in which she planted her own vegetables. From March 2, 1970, through December *373 1971, she paid all the utility bills for the home out of her own funds. She paid no rent for use of the house and John and Helen Bianchi during this time made no attempts to sell or rent the house. Neither at the time the annuity agreements were entered into nor after were there any discussions concerning whether Maria Bianchi would move or pay rent. Prior to Maria Bianchi's entering the hospital, one of John and Helen Bianchi's two sons had expressed a desire to live on the Bianchi Home Ranch. Even after Maria Bianchi had been transferred to the nursing home, her furniture remained in the house on the Bianchi Home Ranch. The house remained vacant until after her death. In 1974, the son moved onto the Bianchi Home Ranch and subsequently used the house which had been Maria Bianchi's personal residence. On January 29, 1971, the California Superior Court held a hearing on the petition of Philip Bianchi to have a conservator appointed for his mother. At this hearing, Maria Bianchi was called as a witness. In response to certain questions asked her, she made several statements to the effect that she lived in her own home and that the property on which it was located was her son *374 John's and that while she lived the home was hers but would be John's when she died. In a written agreement dated December 20, 1971, Philip Bianchi agreed to drop the suit he had commenced in the California Superior Court. In return for his promise to drop the suit and forbear from any further legal actions of a similar nature, Philip Bianchi received a cash gift from Maria Bianchi in the amount of $25,000. Maria Bianchi was competent to manage her affairs at all times prior to March 24, 1971. However, at least after December 31, 1972, she was no longer legally competent to manage her financial affairs. On March 23, 1971, Maria Bianchi forgave the indebtedness of the lump-sum payments due her that year under the contracts for sale of the Bianchi Home Ranch and the LeBaron-Norbell Farm. On the same day, she made cash gifts of $12,000 each to Peter Bianchi and Amelia Lombella. The gifts were reported on a Federal gift tax return for the calendar quarter ending March 31, 1971. The return computed a gift tax due of $67.50.
In a Federal gift tax return for the calendar quarter ending December 31, 1971, the $25,000 cash gift made to Philip Bianchi in return for his agreeing *375 to drop the suit commenced in the California Superior Court was reported. The return computed that a gift tax of $1,657.50 was due. [2]
On October 10, 1972, Maria Bianchi executed two documents providing for the forgiveness of the lump-sum payments due her that year under the contracts for the sale of the Bianchi Home Ranch and the LeBaron-Norbell Farm. On that same date, she also made cash gifts of $12,000 each to Peter Bianchi, Amelia Lombella, and Philip Bianchi. A Federal gift tax return for the calendar quarter ending December 31, 1972, was filed which reported all of the gifts described in the paragraph above. The return reported a gift tax due of $3,900. The lump-sum payments due Maria Bianchi for the year 1973 under the contracts for sale of the Bianchi Home Ranch and the LeBaron-Norbell Farm were never made or forgiven. Respondent in his statutory notice determined a deficiency of $173,903 against the estate. The statutory notice contained the following *376 explanatory statements: EXPLANATION OF ADJUSTMENTS
RETURNED
DETERMINED
(a) Real Estate, Schedule A
Item 1 - Property known as the "Home Ranch"
$ 0.00
$300,000.00
Item 2 - Property known as the "LeBaron Ranch"
0.00
150,000.00
Totals
$ 0.00
$450,000.00
Increase in value of the gross estate
$450,000.00
The fair market value of the above properties at the decedent's date of death is includable in her gross estate under Internal Revenue Code sections 2033 and 2036. Alternatively, should purported annuity contracts in connection with these properties be held to have substance, the amount includable in the gross estate shall be reduced, in accordance with Code section 2043, by the amount of the consideration received by the decedent. (b) Transfers During Decedent's Life, Schedule G
Item 1 - Cash gift, March 23, 1971
$ 0.00
$24,000.00
Item 2 - Cash gift, December 20, 1971
0.00
25,000.00
Item 3 - Cash gift, October 10, 1972
0.00
36,000.00
Totals
$ 0.00
$85,000.00
Increase in value of gross estate
$85,000.00
No portion of the above gifts was included in the gross estate of the decedent, although *377 they were reflected as having been gifted by the decedent on the dates shown above; it is held that these cash gifts are includable in the gross estate under the provisions of section 2035 of the Internal Revenue Code. Additionally, in connection with the purported transactions reflected in item (a) above, the decedent forgave purported indebtedness in the amount of $42,000.00, within three years of her death. This amount, which is reflected in the total adjustment in (a) above, is includable pursuant to Code section 2035. By way of an amendment to his answer, respondent asserted that the lump-sum payments due decedent in 1973 under the annuity contracts were neither paid nor forgiven and are includable in the gross estate. Petitioner's counsel at the trial conceded that these amounts represented amounts owed to decedent properly includable in the gross estate under section 2033. Respondent subsequently has abandoned his contention that the two farm properties are includable in the gross estate under section 2033, and now proceeds solely on the basis that such properties are includable under section 2036. OPINION The first issue presented is whether *378 the two farm properties are includable in the gross estate under section 2036. Section 2036 provides in pertinent part as follows: SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE. (a) General Rule.--The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death -- (1) the possession or enjoyment of, or the right to the income from, the property, or * * *. Petitioner, on reply brief, concedes that the evidence shows that the annuity transactions were not bona fide sales for full and adequate consideration in money or money's worth. Thus, the only remaining issue with respect to the inclusion of the real property in decedent's gross estate is whether Maria Bianchi retained for her life the possession *379 or enjoyment of, or the right to income from, the properties.
Section 2036 requires property to be included in a decedent's gross estate if he retained the actual possession or enjoyment thereof, even though he may have had no enforceable right to such possession or enjoyment. Guynn v. United States,437 F.2d 1148 (4th Cir. 1971); McNichol's Estate v. Commissioner,265 F.2d 667 (3d Cir. 1959), affg. 29 T.C. 1179 (1958). Possession or enjoyment of the property is retained when there is an express or implied understanding to that effect among the parties at the time of the transfer. Guynn v. United States,supra;Estate of Rapelje v. Commissioner,73 T.C. 82, 86 (1979). In determining whether there was an implied understanding between the parties, all the facts and circumstances surrounding the transfer and subsequent use of the property must be considered. Estate of Rapelje v. Commissioner,supra at 86; *380 section 20.2036-1, Estate Tax Regs. Further, even after concluding that there was such an implied agreement or understanding, it must be determined whether decedent retained an interest in all, or in only a portion of, the transferred property. Section 20.2036-1(a), Estate Tax Regs., specifically states that if decedent retained or reserved an interest or right to income with respect to only part of the property transferred by him, the amount to be included in the gross estate under section 2036 is only such corresponding portion of the value of the property transferred. In our view, the record clearly shows an implied agreement or understanding that Maria Bianchi could continue to live in the personal residence she had maintained on the Bianchi Home Ranch for the rest of her life. Even after entering into the annuity agreement with her son, John Bianchi, and his family for the transfer of the property, she continued to live in the home until she entered a nursing home in early 1972. The home remained vacant after she had gone to the nursing home. Her personal furniture remained in the home and the home itself was unoccupied until well after her death. Moreover, Maria Bianchi, *381 herself, at the hearing before the California Superior Court, made statements that the home was hers while she lived. The facts present amply support a finding that she had retained the possession or enjoyment of the residence until her death. Estate of Linderme v. Commissioner,52 T.C. 305 (1969). However, it is respondent's position that Maria Bianchi retained an interest in the entire two properties transferred so as to cause both properties to be fully includable in her gross estate under section 2036(a)(1). The record does not support this contention. While, as discussed above, decedent retained the exclusive use and possession of the home on the Bianchi Home Ranch, she did not retain the possession or use of the other portions of the two transferred properties. These other portions of the two properties were utilized by John Bianchi and his family and Elsie Titus and her family in the operation of their respective dairy businesses. Respondent, however, makes the further argument that the monthly annuity payments which Maria Bianchi received were in actuality disguised rental payments so that she did retain an interest in these other portions of the transferred *382 properties. Respondent asserts that the parties understood that only the monthly annuity payments would have to be made to Maria Bianchi since she would forgive the annual lump-sum payments to be made under the two annuity contracts. Respondent points out that the total amount of monthly annuity payments in a year roughly corresponds to the amount of rent paid under the prior leases.
We do not agree with this recharacterization of the monthly payments received by decedent. The record does not support respondent's contention that there existed a prearrangement between the parties for the forgiveness of the annual payments. In effect, respondent is urging us to find that transfers involving the two properties were shams, although he has abandoned his previous contention that the two properties are includable in the gross estate under section 2033. Maria Bianchi's transfer of the two farm properties were not nullities. On the date she entered into the two annuity contracts, she also executed a quitclaim deed to each of the properties. Both of these deeds were promptly recorded. Respondent has stipulated that Maria Bianchi had the legal capacity to transfer the two properties. *383 As was pointed out in Fidelity-Philadelphia Trust Co. v. Smith,356 U.S. 274, 280 (fn. 8) (1958): Where a decedent, not in contemplation of death, has transferred property to another in return for a promise to make periodic payments to the transferor for his lifetime, it has been held that these payments are not income from the transferred property so as to include the property in the estate of the decedent. * * * In these cases the promise is a personal obligation of the transferee, the obligation is usually not chargeable to the transferred property, and the size of the payments is not determined by the size of the actual income from the transferred property at the time the payments are made. See also Cain v. Commissioner,37 T.C. 185, 188 (1961). [3]
*384 As of February 14, 1974, the date of decedent's death, the dwelling and the appurtenant land which together constituted Maria Bianchi's home had a fair market value of $12,500. The parties have stipulated that the fair market value of the Bianchi Home Ranch on the date of decedent's death was $332,000.Respondent's expert valued the land alone which constituted the Bianchi Home Ranch at a fair market value on the date of decedent's death of $320,000, which he arrived at by valuing the land to be worth approximately $500 per acre. Respondent's expert in his report specifically excluded the value of the dwelling. Thus, the difference between the stipulated fair market value of the Bianchi Home Ranch and the $320,000 value at which respondent's expert appraised the land represents the value of the structure. In arriving at our valuation for the home, we have added to this $12,000 value of the structure the value of the 1 acre of land, which constituted the appurtenant land upon which the dwelling stood.Therefore, we find that the $12,500 fair market value of the home on the date of decedent's death is includable in her gross estate. [4]
*385 The remaining issues for decision concern whether the cash gifts decedent made to certain of her children and the gifts she made by way of forgiving the lump-sum annuity payments which would be owed to her under the annuity agreements were transfers in contemplation of death under section 2035. The purpose of section 2035 is to prevent evasion of Federal estate taxes by taxing lifetime transfers which are essentially substitutes for testamentary dispositions. United States v.Wells,283 U.S. 102, 116-117 (1931). In determining whether a gift was in contemplation of death, it must be determined whether the dominant purpose of decedent in making the transfer was a thought of death or some purpose more clearly associated with life. Estate of Alvin Hill v. Commissioner,64 T.C. 867, 878 (1975).
Maria Bianchi was in her early nineties at the time these transfers were made. Petitioner asserts that the transfers were made for life motives and as a part of a pattern of gift making. The record, however, does not support this contention. The gift tax return *386 filed by decedent for 1970 shows that decedent had never made any sizable gifts prior to that time. It was only beginning in 1970 that decedent began to make sizable gifts. The transfers made in 1970 were made more than three years before the date of decedent's death and thus are not transfers made in contemplation of death under section 2035. Section 2035(b). Nevertheless, the inference to be drawn from the record is that the 1970 gifts as well as the later gifts here in issue, which were made during the three-year period before decedent's death, were all steps taken in a plan to diminish the estate taxes to be paid by Mrs. Bianchi's estate. See Estate of Himmelstein v. Commissioner,73 T.C. 868, 878 (1980); Estate of McIntosh v. Commissioner,25 T.C. 794, 804 (1956), affd. 248 F.2d 181 (2d Cir. 1957); Estate of Hill v. Commissioner,23 T.C. 588, 591 (1954), affd. 229 F.2d 237 (2d Cir. 1956).
Deceden's attorney at trial stated that in 1970 he had been anxious to have some estate planning done by Mrs. Bianchi, and he admitted that the entire purpose of the annuity transactions was estate planning. *387 On cross-examination, he further added that at the time he had felt that Mrs. Bianchi had more than enough to live on in view of the large sum of money she had in her bank account and the $600 in monthly payments she would receive under the two annuities. The annuity agreements were drafted so as to facilitate Mrs. Bianchi's making gifts by way of forgiving the annual lump-sum payments. Had Mrs. Bianchi not forgiven the payments, the money she received would have only increased the amount of property on hand at her death to be included in her estate. The cash gifts made by Mrs. Bianchi were also made pursuant to the advice of her attorney. The attorney testified that basically whenever Mrs. Bianchi forgave the annuity payment, she would make equivalent cash gifts of $12,000 each to her other three children. The evidence of record strongly indicates that these gifts were intended as substitutes for testamentary disposition. We thus find the transfers in issue which were made during the three-year period prior to decedent's death to have been made in contemplation of death. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the year here in issue.↩
2. The settlement agreement reached provided that Maria Bianchi would pay only the first $500 of the State and Federal gift taxes on said gift, with Philip Bianchi paying any gift taxes in excess of $500.↩
3. Since decedent transferred the two farm properties more than three years before the date of her death, the two transfers were not in contemplation of death. Sec. 2035(b)↩. Prior to the enactment of the Revenue Act of 1950, sec. 501(a), 64 Stat. 906, 962, the predecessor statute contained no equivalent cutoff provision treating transfers made more than three years prior to the date of death as not being in contemplation of death.
4. We recognize that sec. 2043 provides that the amount includable in the gross estate is only the excess of the fair market value at the time of death over the value of the consideration received by decedent. For purposes of sec. 2043, consideration received is valued as of the date of the transfer. United States v. Righter,400 F.2d 344, 347↩ (8th Cir. 1968). Petitioner, however, has not introduced any evidence as to the value of the private annuity on the date of the transfer much less any evidence suggesting what portion of the value of the private annuity could be allocated to the home. At any rate, the value of the home constitutes only a small percentage of the overall value of the entire property.