ESTATE OF SUMNER GERARD, CHEMICAL BANK NEW YORK TRUST COMPANY, C. H. COSTER GERARD, SUMNER GERARD, JR., JAMES W. GERARD II, EXECUTORS, PETITIONER *v.* COMMISSIONERS OF INTERNAL REVENUE, RESPONDENT

Docket No. 5573–69.   Filed March 13, 1972.

*John P. Campbell, Robert D. Whoriskey,* and *Anthony J. Leitner,* for the petitioner.

*Agatha L. Vorsanger,* for the respondent.

QUEALY, *Judge:* The respondent determined a deficiency in the Federal estate tax of the Estate of Sumner Gerard, deceased, in the amount of $4,111,906.38. Except for certain gifts by the decedent, the various issues have been disposed of by agreement of the parties. Consequently, the only issue remaining for decision is whether the transfer by the decedent on January 2, 1964, of 51 shares of stock in Aeon Realty Co., distributed in equal portions to his three sons, was made in contemplation of death within the meaning of section 2035.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Sumner Gerard (hereinafter referred to as the decedent) was born on August 25, 1874, and died on March 10, 1966. The executors of his estate are the three sons of the decedent, C. H. Coster Gerard, Sumner Gerard, Jr., and James W. Gerard II, and the Chemical Bank New York Trust Co. (hereinafter referred to as Chemical Bank). The Federal estate tax return was filed with the district director of internal revenue, Manhattan, New York.

At the time of the filing of the petition herein, the legal residences of C. H. Coster Gerard, Sumner Gerard, Jr., and James W. Gerard II, were New York, N.Y., Princeton, N.J., and Bay Harbor, Maine, respectively. The principal place of business of Chemical Bank was New York, N.Y.

Following World War II, Sumner Gerard, Jr., desired to move to the western region of the United States. He began studying the ranching business, and in 1947 he toured several western states. On that

---

[1] All statutory references are to the Internal Revenue Code of 1954, unless otherwise indicated.

tour, he located a ranch in Ennis, Mont. He made a recommendation to his father, the decedent, that said parent purchase the ranch.

In 1948, the decedent purchased all the stock of the Ennis Co., the corporation that owned the ranch. Sumner Gerard, Jr., and his family moved onto the ranch at that time, and continued to reside there at all times material hereto.

In 1954, the Ennis Co. was liquidated and a partnership was formed. On December 31, 1958, the Ennis Co. (hereinafter referred to as Ennis) was reincorporated and the assets of the partnership, consisting principally of the ranch, were transferred to the corporation. At that time, Ennis qualified and elected to be taxed as a "small business corporation" within the provisions of subchapter S of the Internal Revenue Code of 1954. It continued to be taxed in this manner through the date of the decedent's death.

Upon its reincorporation, the decedent received 2,680 shares of the outstanding capital stock of Ennis, which he held through the date of the decedent's death. The remaining 1,320 shares of stock were issued to and held by Sumner Gerard, Jr., and his wife.

As an asset of Ennis, the ranch was run as a livestock operation. The cattle (and some horses) were either bought or bred and then fed and sold as either calves, yearlings, or 2-year-olds, depending upon the state of the market. Depreciation was taken on the purchased animals.

During the calendar years 1959–63, the annual operating statements of Ennis reported net operating losses in the following amounts:

| Year | Loss |
| --- | --- |
| 1959 | $72,182.02 |
| 1960 | 14,582.24 |
| 1961 | 40,705.99 |
| 1962 | 46,966.50 |
| 1963 | 121,651.01 |

In addition, during the same calendar years, the corporate income tax returns for Ennis reported losses in the following amounts:[2]

| Year | Loss |
| --- | --- |
| 1959 | $72,182.02 |
| 1960 | 4,272.14 |
| 1961 | 28,310.09 |
| 1962 | 32,317.47 |
| 1963 | 121,651.01 |

[2] The difference between the net operating losses of Ennis and the losses reported on the corporate income tax returns for the calendar years 1960, 1961, and 1962 is attributable to the income received by Ennis in those years and reported and labeled as "OTHER INCOME" on its annual operating statements. This income included gain realized by Ennis from the sale of another ranch and reported by it on the installment basis as allowed within the provisions of sec. 453 and the receipt of interest attributable to a certain contract not material to this case. There was also a loss reported by Ennis in 1962 attributable to a well-drilling operation.

These operating and income statements, however, do not reflect the inventory of cattle and other animals unsold and present on the ranch at the end of each calendar year. Since Ennis was a subchapter S corporation, the decedent and Sumner Gerard, Jr., were each allowed to reflect portions of the losses of Ennis on their respective Federal income tax returns for these years.

Ennis borrowed funds on a continuing basis from the Metals Bank & Trust Co. of Butte, Mont. (hereinafter referred to as Metals Bank). At the end of each of the calendar years 1959-63, the loan account of Ennis with Metals Bank showed balances in the following amounts:

| Year | Amount |
|------|--------|
| 1959 | $157, 749. 04 |
| 1960 | 147, 079. 85 |
| 1961 | 179, 619. 11 |
| 1962 | 277, 138. 48 |
| 1963 | 300, 769. 04 |

The loans by Metals Bank to Ennis were secured by the cattle of Ennis, and by marketable securities owned by the decedent and by Sumner Gerard, Jr., and his wife. In 1961, the decedent pledged 700 shares of stock of Standard Oil of New Jersey to Metals Bank on behalf of Ennis. At that time, the decedent stated by letter that an objective in making such pledge was to permit the bank to release "all or the greater portion of [Sumner Gerard, Jr.'s] securities" that had been pledged to Metals Bank on behalf of Ennis, so that he could "use such returned securities in furthering some other enterprise in which he is interested." In March 1963, the decedent pledged 200 shares of IBM stock to Metals Bank as additional security for the loans.

As of March 27, 1963, Metals Bank advised Sumner Gerard, Jr., that the marketable securities held by it were in excess of the collateral required and offered to release to Sumner Gerard, Jr., securities valued at $37,000. It did release such securities to Sumner Gerard, Jr., later in that year. After the release, these securities were kept in a safe-deposit box.

The loss reported by Ennis on its operating and income statements for the calendar years 1959-63 included interest payments that Ennis was required to make on outstanding bank loans in the following amounts:

| Year | Interest expense |
|------|------------------|
| 1959 | $14, 251. 52 |
| 1960 | 11, 608. 50 |
| 1961 | 17, 120. 67 |
| 1962 | 17, 304. 91 |
| 1963 | 26, 833. 24 |

In 1961, Sumner Gerard, Jr., paid $25,000 for a 50-percent interest in the Yellowstone Feed & Cattle Co. (hereinafter referred to as Yellowstone), located in Billings, Mont. The remaining stock of Yellowstone was received by Marshall Young (hereinafter referred to as Mr. Young) and his wife, in exchange for a leasehold interest valued at $25,000 on the minutes books of Yellowstone. Yellowstone, a Montana corporation, operated a livestock-feeding business. It purchased cattle on credit, fed them, and subsequently sold them.

In order to finance this business, Yellowstone arranged a revolving line of credit with the First National Bank & Trust Co. (hereinafter referred to as the First National Bank). In establishing this arrangement, First National Bank required personal guarantees of Yellowstone's obligation by both Sumner Gerard, Jr., and Mr. Young up to $200,000, respectively.

In 1961 and 1962, Yellowstone reported small profits on its net operating statements. However, in 1963, the company reported a net operating loss of $89,062.29. A factor in this reversal was the fall in the price of "fat" cattle in the open market during that year.[3]

In order to obtain financing to continue its operations, Yellowstone liquidated some of its inventory and increased its open market indebtedness for feed and supplies. In addition, in 1963, Sumner Gerard, Jr., contributed additional funds to the capital of Yellowstone in the total amount of $51,000.

Sometime after becoming a resident of Montana, Sumner Gerard, Jr., became active in Montana State politics. He won election to the Montana State Legislature in 1954. Thereafter, beginning in 1955, he served three successive 2-year terms in the house, serving in the 1959 session as its minority leader. In 1960, he waged an unsuccessful campaign for the Republican nomination from Montana to the U.S. Senate. He estimated his personal cost of this campaign at $20,000. In 1961, he was elected to the Montana State Senate. He served two 4-year terms in the senate, and in 1964 served as its minority leader.

The decedent took an interest in his son's political career. He made modest contributions to his son's campaign for the U.S. Senate, to various congressional candidates suggested by his son, and to the Montana Republican Party.

Sumner Gerard, Jr., has five children. They are Jenny, born in 1945; Molly, born in 1947; Helen, born in 1949; Anne, born in 1951; Sumner III, born in 1953. As his children grew older, Sumner Gerard, Jr., incurred increasing expenses in providing for their education. During the calendar years 1962–64, he incurred such expenses in the following amounts:

---

[3] In the terminology of the business, "fat" cattle has reference to cattle that have been fed so as to be ready for sale on the market.

| Year | Annie Wright Seminary | Vassar College | Foxcroft School | Total |
|------|----------------------|----------------|-----------------|-------|
| 1962 | $10,279.75 | | | $10,279.75 |
| 1963 | 11,070.60 | $1,700.00 | | 12,770.60 |
| 1964 | 9,369.25 | 2,866.50 | $1,930.62 | 14,166.37 |

During the calendar years 1959–63, Sumner Gerard, Jr., reported income on his Federal income tax returns in the following amounts:[4]

| Year | Salary | Dividends | Interest | Net capital gains (losses) before 50-percent deduction | Other |
|------|--------|-----------|----------|------------------------------------------------------|-------|
| 1959 | $1,400 | $12,821 | $5,285 | $43,694 | |
| 1960 | 5,489 | 12,604 | 2,854 | 1,117 | $10,812 |
| 1961 | 5,403 | 11,308 | 5,387 | (3,341) | 1,078 |
| 1962 | 8,399 | 13,471 | 7,428 | (18,744) | |
| 1963 | 1,874 | 14,139 | 9,078 | 3,366 | 403 |

In addition, during the calendar years 1959–63, Sumner Gerard, Jr., as a legatee of the Estate of Mary D. Gerard, received distributions of securities in the following amounts:

| Year | Shares | Subject | Total value credited |
|------|--------|---------|---------------------|
| 1961 | 448 | Aluminum, Ltd | $11,984 |
| | 248 | Creole Petroleum | 9,982 |
| | 644 | Crystal Oil | 4,628 |
| | 48 | Kennecott Copper | 3,891 |
| | 248 | Texas Utilities | 24,676 |

He also owned a considerable amount of other marketable securities during these years.

During the calendar years 1959–63, Sumner Gerard, Jr., and his family occupied the residence on the Ennis ranch without the payment of any rent. The ranch employees performed services for them for which he incurred no personal expense. Ennis owned an airplane which was available for his personal use.

During the calendar years 1960–63, Sumner Gerard, Jr., was forced to borrow funds in order to defray his expenditures. He borrowed such funds from Ennis on a continuing basis. The yearend balances of his loan account with Ennis in the above-stated years were as follows:

---

[4] The amounts reported on these returns do not appear consistent with certain stipulations of fact. However, since both parties have agreed that the above-stated figures be included as a finding of fact, we will accept them.

| Year | Balance |
|------|---------|
| 1960 | $16,713.88 |
| 1961 | 23,455.74 |
| 1962 | 40,405.00 |
| 1963 | 65,563.50 |

In addition, Sumner Gerard, Jr., borrowed funds from other sources during these years. He pledged most of his marketable securities to secure these loans. As of December 31, 1963, he had outstanding loans amounting to $167,563 as follows:

| Source | Amounts |
|--------|---------|
| First National Bank & Trust Co., Billings | $45,000 |
| Midland Bank, Billings | 37,000 |
| Chemical Bank New York Trust Co | 20,000 |
| Ennis Co | 65,563 |
| Total loans outstanding | 167,563 |

Mrs. Sumner Gerard, Jr., had received approximately 30 shares of IBM stock from her parents, which by 1963 had increased to 54 shares as a result of stock dividends. As of the end of 1963, these shares were pledged with Metals Bank on behalf of Ennis in securing loans.

Prior to and during 1963, petitioner discussed his financial problems with the decedent.

During 1963, Mr. Hugh V. Galusha (hereinafter referred to as Mr. Galusha), a financial adviser of Ennis, and a close friend of Sumner Gerard, Jr., and of the decedent, visited decedent several times at his home in New York City. During these visits, decedent expressed to Mr. Galusha concern over the financial condition of Sumner Gerard, Jr. The decedent was told by Mr. Galusha that the capacity of Ennis to support additional loans "had been extinguished." Mr. Galusha suggested to decedent that Sumner Gerard, Jr., needed a new "transfusion of capital."

Sometime during 1963, after receiving Mr. Galusha's advice, the decedent told Mr. Galusha that he was going to transfer to Sumner Gerard, Jr., shares of stock in Aeon Realty Co. (hereinafter referred to as Aeon). Aeon was a New York corporation which had outstanding 108 shares of stock. Aeon held a number of properties in Manhattan, along with other real estate in the surrounding areas. At this time, the decedent owned all of the stock of Aeon. Decedent also indicated that he would make similar, equalizing transfers to his other two sons, Coster and James.

In making such transfer of stock, decedent indicated concern with payment of the gift taxes accruing from the transfer, which he was informed would be approximately $1 million. He eventually raised

the money to pay such taxes by borrowing the funds from Chemical Bank, pledging certain shares of IBM stock as collateral.

On January 2, 1964, decedent gave each of his sons 17 shares of Aeon stock. Thereafter, decedent continued to own the remaining 57 shares of Aeon stock until his death.

During the fall of 1963, Sumner Gerard, Jr., through his attorney, contacted Chemical Bank as to whether said bank would make loans to petitioner for educational purposes against a note secured by certain stock of Aeon. Chemical Bank did not consider the stock of Aeon to be a marketable security. However, Chemical Bank was familiar with some of the properties owned by Aeon, as well as both Sumner Gerard, Jr., and the decedent. For purposes of collateral, Chemical Bank placed a valuation of $500,000 on the 17 shares of Aeon stock to be given to Sumner Gerard, Jr. The decedent was a continuing customer of said bank, and the bank therefore agreed to make loans up to at least $200,000 against such stock.

On July 10, 1964, Sumner Gerard, Jr., forwarded the Aeon stock he had received from the decedent to Chemical Bank. In a letter sent to Chemical Bank at that time, Sumner Gerard, Jr., advised that the stock had a market value of $950,000 for "tax purposes." He also advised that he had "no immediate need for funds." However, beginning shortly thereafter, Sumner Gerard, Jr., did borrow funds against this collateral, and he continued to borrow for some time thereafter on a periodic basis. The loan never exceeded the total amount of $70,000.

At the time he made the gift of the Aeon stock, the decedent was 89 years of age. In 1959, he had suffered a gall bladder attack which required two operations. He suffered from emphysema and chronic bronchitis, an illness which caused the decedent to cough and to experience shortness of breath. He also had suffered periodically since 1959 from a prostatic infection, which affected his kidney and bladder, interfered with the passing of urine, and sometimes caused a fever. In addition, he suffered from cataracts, which hampered his vision and caused him pain. None of the above illnesses were such that they would cause decedent's death within a predictable period of time; however, after 1961, the emphysema forced the decedent to be confined to his home. During the period 1960–63, the decedent had a full-time day nurse at his house. At times, he required help in moving from room to room.

In May 1962, the decedent expressed fear to his physician that he was going to have a stroke.

During 1963, the decedent developed abdominal pains and at this time he expressed fear to his physician that he might be suffering from cancer. However, in May 1963, he was X-rayed, and the X-rays proved

756

negative, i.e., they showed that he was not suffering from cancer in the abdominal region of his body.

On September 26, 1963, the decedent wrote to his family physician that "I am still hanging on but my condition is now such that I fear it requires the expert medical know-how of your good self."

On November 4, 1963, the decedent wrote to another doctor:

I am 87 years old give or take a year. * * * I have undergone two major operations, * * *. For the last year or two my urinary machinery has gone on the blink. * * *

Finally, I suffer from emphysema to such an extent that the nurse has to help me to go to the bathroom and afterwards go to the front room where I sit in an easy chair before the TV and the radio.

In 1966, the decedent was admitted into a hospital with intestinal obstructions, and died of an intestinal hemorrhage on March 10, 1966.

The decedent's physician testified that, during his treatments of the decedent, the decedent never showed any signs of senility.

Prior to the gifts of the Aeon stock on January 2, 1964, the decedent made no taxable gifts, other than certain gifts in trust for his three sons, made in 1935. During his lifetime, the decedent personally retained control over the majority of his assets and all of his corporations.

For each of several years prior to his death, the decedent customarily gave each of his sons a check in the amount of $25 at Christmas. He also gave yearly gifts of approximately $1,500 to each of his grandchildren.

On April 27, 1964, the decedent gave to each of his sons rights to certain Alabama mineral interests. The gift received by each son was valued at $6,883.33.

On August 27, 1965, the decedent gave to each of his sons one-third of his interest in the Texas property of the Estate of Mary Gerard. The gift received by each son was valued at $21,987.33.

On his notice of deficiency, respondent determined that the 51 shares of Aeon stock given by decedent to his sons on January 2, 1964, were includable in the gross estate of the decedent pursuant to section 2035, at a total value of $3,276,232.35. The total value of the Aeon stock at date of death has now been stipulated by the parties to be $2,090,796, or $40,996 per share.[5]

ULTIMATE FINDING OF FACT

The transfer of 51 shares of Aeon stock by the decedent to his sons on January 2, 1964, followed by his death within 3 years of such

---

[5] The petitioners, as executors of the Estate of Sumner Gerard, did not elect the alternate valuation date provided for in sec. 2032.

transfer, constituted a gift made in "contemplation of death" within the meaning of section 2035.

### OPINION

The decedent was the father of three sons, C. H. Coster Gerard, James W. Gerard II, and Sumner Gerard, Jr. On January 2, 1964, at the age of 89, the decedent gave to each of his sons 17 shares of Aeon stock, a total disposition of 51 shares. After this gift, the decedent continued as owner of the remaining 57 shares of Aeon stock.

The decedent died on March 10, 1966. The total date-of-death value of 51 shares of Aeon stock was $2,090,796.

The single issue presented for decision in this case is whether the above transfer by the decedent of Aeon stock was made in contemplation of death within the meaning of section 2035. Section 2035 provides that the value of the gross estate shall include the value of all property transferred by a decedent in contemplation of death. It further creates a rebuttable presumption that any transfer, regardless of its size in proportion to the total amount of the gross estate, made by a decedent within 3 years preceding the date of his death is a transfer made in contemplation of death.[6]

The presumption is one of law, rather than fact. As such, it is not evidence in and of itself. *Gillette's Estate* v. *Commissioner*, 182 F. 2d 1010 (C.A. 9, 1950); *Hemphill Schools* v. *Commissioner*, 137 F. 2d 961 (C.A. 9, 1943). However, the estate or party challenging the determination of the Commissioner must not only come forward with evidence that the gift is not made by the decedent in contemplation of death, *Flannery* v. *Willcuts*, 25 F. 2d 951 (C.A. 8, 1928), but must also carry the burden of proof. *McCaughn* v. *Real Estate Co.*, 297 U.S. 606 (1936); *Reeves' Estate* v. *Commissioner*, 180 F. 2d 829 (C.A. 2, 1950), certiorari denied 340 U.S. 813 (1950); *O'Neal's Estate* v. *Commissioner*, 170 F. 2d 217 (C.A. 5, 1948); *Humphrey's Estate* v. *Commissioner*, 162 F. 2d 1 (C.A. 5, 1947), certiorari denied 332 U.S. 817 (1947); *First Trust & Deposit Co.* v. *Shaughnessy*, 134 F. 2d 940

---

[6] SEC. 2035. TRANSACTIONS IN CONTEMPLATION OF DEATH.

(a) GENERAL RULE.—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, in contemplation of his death.

(b) APPLICATION OF GENERAL RULE.—If the decedent within a period of 3 years ending with the date of his death (except in case of a bona fide sale for an adequate and full consideration in money or money's worth) transferred an interest in property, relinquished a power, or exercised or released a general power of appointment, such transfer, relinquishment, exercise, or release shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this section and sections 2038 and 2041 (relating to revocable transfers and powers of appointment); but no such transfer, relinquishment, exercise, or release made before such 3-year period shall be treated as having been made in contemplation of death.

(C.A. 2, 1943), certiorari denied 320 U.S. 744 (1943); *Oliver* v. *Bell*, 103 F. 2d 760 (C.A. 3, 1939); *Estate of Carol C. Lynch*, 35 T.C. 142 (1960).

The phrase "contemplation of death" has been defined by the Supreme Court in *United States* v. *Wells*, 283 U.S. 102 (1931), wherein the Court stated:

The words "in contemplation of death" mean that the thought of death is the impelling cause of the transfer, and while the belief in the imminence of death may afford convincing evidence, the statute is not to be limited, and its purpose thwarted, by a rule of construction which in place of contemplation of death makes the final criterion to be an apprehension that death is "near at hand."

Thus, "Death must be 'contemplated,' that is, the motive which induces the transfer must be of the sort which leads to testamentary disposition." *United States* v. *Wells, supra*. Where this motive, rather than a purpose associated with life, is the dominant reason for the transfer, the gift is in contemplation of death within the meaning of the statute, even if it is not made on account of the thought of imminent death. *United States* v. *Wells, supra*.

The test of inclusion under section 2035 is based on a determination as to the dominant motive which was the "impelling cause" of the transfer. The decision in any given case is a question of fact relating to the decedent's state of mind at the time of the transfer. In turn, this state of mind is to be determined from a consideration of all facts and circumstances present in a given case. *United States* v. *Wells, supra; Estate of Verne C. Hunt*, 14 T.C. 1182 (1950); *Allen* v. *Trust Co.*, 326 U.S. 630 (1946); *In re Kroger's Estate*, 145 F. 2d 901 (C.A. 6, 1944), certiorari denied 324 U.S. 866 (1945).

In *Estate of Oliver Johnson*, 10 T.C. 680 (1948), this Court stated that among the factors to be considered in determining the dominant motive of a decedent in making an *inter vivos* transfer of property are:

(a) The age of the decedent at the time the transfers were made; (b) the decedent's health, as he knew it, at or before the time of the transfers; (c) the interval between the transfers and the decedent's death; (d) the amount of the property transferred in proportion to the amount of property retained; (e) the nature and disposition of the decedent, e.g., whether cheerful or gloomy, sanguine or morbid, optimistic or pessimistic; (f) the existence of a general testamentary scheme of which the transfers were a part; (g) the relationship of the donee or donees to the decedent, i.e., whether they were the natural objects of his bounty; (h) the existence of a long established gift-making policy on the part of decedent; (i) the existence of a desire on the part of the decedent to escape the burden of managing property by transferring the property to others; (j) the existence of a desire on the part of the decedent to vicariously enjoy the enjoyment by the donees of the property transferred; and (k) the existence of the desire by the decedent of avoiding estate taxes by means of making *inter vivos* transfers of property. * * *

The petitioners argue that motives associated with life were the dominant reasons for the transfers in question. They argue that the decedent's predominant motive was to assist his son, Sumner Gerard, Jr., who was burdened with substantial indebtedness and a serious financial situation, and that the equalizing transfers to his other sons were made out of a sense of fairness and in order to preserve family harmony. The petitioners contend that the gift in question was to enable Sumner Gerard, Jr., to secure his existing loans and to be used as collateral to obtain additional loans.[7] From this, they argue that the gifts by the decedent to his sons were not made in contemplation of death.

A decedent's desire to provide financial assistance for one or more of his offspring is a motive which has been clearly recognized as a valid basis for making a transfer not in "contemplation of death." *Estate of Lillie G. Hutchinson*, 20 T.C. 749 (1953) ; *Estate of C. Dudley Wilson*, 13 T.C. 869 (1949) ; *Estate of Fletcher E. Awrey*, 5 T.C. 222 (1945), acq. 1945–1 C.B. 1; *Commercial National Bank*, 36 B.T.A. 239 (1937), acq. 1938–1 C.B. 6. It is also clear that a decedent's intent to be fair to his other offspring and to maintain family harmony by giving equal gifts to all his children has also been considered to be a motive associated with life. *Estate of John Moir*, 47 B.T.A. 765 (1942) ; *Estate of N. C. Foster*, 25 B.T.A. 414 (1932). See also *Estate of Carol C. Lynch*, *supra; Taylor* v. *United States*, —— F. Supp. —— (N.D. Cal. 1970).

However, these factors alone are not decisive. *Estate of Oliver Johnson*, *supra*. Rather, they must be considered along with all of the other facts and circumstances present in a given case. *United States* v. *Wells*, *supra; Allen* v. *Trust Co.*, *supra*. In the context of this case we find them to be of little probative value in determining the decedent's motive for the transfer of Aeon stock to his sons.

At the time of the transfers in question, the decedent was almost 90 years of age. He was not in good health. Approximately 4 years previous, at age 85, he had undergone two debilitating operations. At the time of the making of the gifts at issue, he suffered from emphysema, chronic bronchitis, and a prostate condition that affected his kidneys and bladder, caused frequent fevers, and otherwise rendered him uncomfortable. He also had cataracts in his eyes which seriously impaired his vision and caused him pain. He was confined to his house and required the care of a full-time day nurse. At times, he needed help in moving from room to room.

---

[7] It is noted that this loan was sought by Sumner Gerard, Jr. (and was granted by Chemical Bank), for "educational purposes." Chemical Bank was willing to loan him approximately $25,000 per year for such purposes. The total amount ultimately borrowed by Sumner Gerard, Jr., with respect to said loan never exceeded $70,000.

The evidence clearly shows that the decedent was aware of his physical condition. Moreover, petitioner also indicated fear that new symptoms that he was experiencing were indicative of even more serious illness.

Age and health, while not decisive, must be given considerable weight in attempting to ascertain the dominant motive for a decedent's transfer of property within the 3-year period prior to his death. *United States* v. *Wells, supra; Burns* v. *Commissioner*, 177 F. 2d 739 (C.A. 5, 1949), affirming 9 T.C. 979 (1947) ; *McClure* v. *Commissioner*, 56 F. 2d 548 (C.A. 5, 1932) ; *Estate of Oliver Johnson, supra.* Here the age of the decedent, the state of his health, and the fact that he was fearful that he might be facing a terminal illness, make it inconceivable that the transfers were not induced by the realization that death was near at hand. See *Liebmann* v. *Hassett*, 50 F. Supp. 537 (D. Mass. 1943), reversed in parts on other grounds 148 F. 2d 247 (C.A. 1, 1945).

This conclusion is further strengthened by the fact that the decedent had no history of prior gifts. Indeed, the evidence clearly shows that, with respect to his sons, the decedent was frugal. The decedent's gifts of Aeon stock to each of his sons in 1964 in excess of $2 million had no counterpart in prior years. The donees of the transfers in question were the decedent's three sons, the natural objects of his bounty who, except for a few small bequests, were the sole legatees under his will.[8] Coming at a time when the decedent was approaching the age of 90 years, such gifts are a strong indication of testamentary intent on the part of the decedent. See *Estate of Oliver Johnson, supra; English* v. *United States*, 270 F. 2d 876 (C.A. 7, 1959).

Subsequent to the gifts in issue, the decedent, on April 27, 1964, gave to each of his sons certain mineral interests in Alabama, each valued at $6,883.33, and also to each cash in the amount of $3,025. On August 27, 1965, he gave to each of them one-third of his interest in the Texas property of the estate of his wife, each one-third interest being valued at $21,987.33. In both instances, as well as with the transfers in question, the gifts were in the same proportion as the subsequent division of the estate provided for in his will. This entire pattern of activity and the identical proportionality in each instance also indicates that the transfers were testamentary in nature. Cf. *The Cleveland Trust Co.* v. *United States*, 421 F. 2d 475 (C.A. 6, 1970). See also *Oliver* v. *Bell, supra; Estate of Robert W. Hite, Sr.*, 49 T.C. 580

---

[8] In his will, the decedent provided cash payments to persons other than his sons in the total amount of $24,000. He also provided a trust to be used for the benefit of his butler and his butler's wife in the total amount of $100,000. In addition, he provided for a charitable contribution to the Sumner Gerard Foundation, the total amount of such contribution to be equal to 10 percent of his gross estate as valued for Federal estate tax purposes. Other than these bequests, his sole legatees in an estate valued at several million dollars were his sons and/or their wives.

(1968); *Estate of Mabel Lloyd Ridgely* v. *United States*, 180 Ct. Cl. 1220 (1967).

While Sumner Gerard, Jr., might well have been in need of financial assistance, the stock of Aeon was not the most suitable vehicle for providing such assistance. It was stock of a closely held corporation. As such, it was difficult to value, had limited marketability, and, as a consequence, was not the most suitable collateral for additional loans or as security for existing loans. On the other hand, the decedent controlled large amounts of marketable securities which were far more suitable for this purpose.

Furthermore, the Aeon stock was the asset which would be the most desirable for the decedent to have removed from his estate in order to avoid the estate tax problems generally associated with this type of asset. As discussed above, the Aeon stock was the stock of a closely held corporation, and would not be readily marketable. These factors could present valuation problems for purposes of computing the estate tax and would render the stock difficult to sell for purposes of obtaining funds to pay the estate tax once it was determined.

By reason of the decedent's age, the condition of his health, and the testamentary nature of the gifts in question, we are impelled to find that the transfers of the Aeon stock by the decedent were, in fact, gifts in contemplation of death within the meaning of section 2035.

*Decision will be entered under Rule 50.*