ESTATE OF WILLIAM D. BENHAM, DECEASED, ELOISE S. BENHAM AND THE BANK OF VIRGINIA TRUST COMPANY, CO-EXECUTORS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Benham v. Commissioner
Docket No. 16224-80.
United States Tax Court
T.C. Memo 1983-337; 1983 Tax Ct. Memo LEXIS 448; 46 T.C.M. (CCH) 408; T.C.M. (RIA) 83337; June 9, 1983. *448 Held: Transfers of insurance policies from decedent to his wife were not in contemplation of death. Ralph E. Mirarchi,Lowell F. Raeder and Shelley R. Goldfarb Goldner, for the petitioners. Howard Philip Newman, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: *449 Respondent determined a deficiency of $55,935.81 in the Federal estate tax of petitioners. The sole issue for decision is whether the proceeds from two life insurance policies owned by decedent's spouse on the date of his death should be included in the estate's gross estate under the pre-1977 version of section 2035. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners are Eloise S. Benham and the Bank of Virginia Trust Company, Co-Executors of the Estate of William D. Benham, Deceased. The parties have agreed that the place of residence of the individual petitioner and the principal place of business of the corporate petitioner was Falls Church, Virginia, when the petition in this case was filed. Dr. William D. Benham died on February 6, 1977, from injuries suffered in a skiing accident. He was only 54 years old when the accident and death occurred and had been in excellent health, both physically and mentally, prior to his death. He had engaged in many sports requiring intensive activity, such as sailing and automobile *450 racing, as well as skiing. Despite an element of danger involved in some of these sports, there was no reason for him to view his death as imminent in 1977. For many years prior to his death, Dr. Benham actively worked as a psychiatrist. In early 1972 Mr. Stanley Telchin, Dr. Benham's insurance and financial advisor, prepared an analysis for him of the economic advantages of incorporating his psychiatric practice, focusing particularly on the availability to a corporation of group insurance plans and pension and profit-sharing plans. He suggested that a professional corporation be formed and that it purchase a group term policy on Dr. Benham's life and that its pension and profit-sharing plans each purchase whole life policies on his life. Dr. Benham accepted these recommendations and formed William D. Benham, M.D., Ltd., of which he was the sole shareholder and principal employee. The corporation and its pension and profit-sharing plans purchased the insurance recommended by Mr. Telchin. The record indicates that this insurance replaced some of the policies previously owned by Dr. Benham or his wife. Prior to the incorporation, Dr. Benham had owned life insurance in the *451 face amount of $120,667 on his life, and his wife had owned $267,000 of insurance on his life. The first policy with which we are concerned here is a group life and group accidental death policy from The Manhattan Life Insurance Company. The parties agree that the Manhattan policy replaced another group term life insurance policy, issued by the National Association of Professional Corporations (NAPC), which had been owned by Mrs. Benham from the inception of that policy on April 15, 1972. In late 1974 or early 1975, Mr. Telchin recommended to Dr. and Mrs. Benham, as well as many of his other clients, that they take out a group term insurance policy with Manhattan to replace the NAPC policy. Mr. Telchin believed that the Manhattan policy provided superior coverage for approximately the same premium as was being paid for the NAPC policy. A comparison of coverages and premiums reveals that Mr. Telchin's opinion was well founded insofar as it relates to the NAPC and Manhattan policies involved here. The cost of the two policies was approximately the same but the Manhattan policy provided $100,000 of life insurance while the NAPC policy provided only $50,000, and the Manhattan policy *452 also provided an accidental death benefit of $100,000. Further benefits were that the Manhattan policy provided for a waiver of premiums in the case of disability, which the NAPC policy did not, and it was renewable until age 70, while the NAPC policy was renewable only until age 65. Because of the insurance company's requirements, Mrs. Benham could not be named as owner of the Manhattan policy on her husband's life when it was purchased by the corporation, as had been done when the NAPC policy was obtained. To avoid this problem, Mr. Telchin had Dr. Benham apply for and receive the Manhattan policy, with Mrs. Benham named as beneficiary. The corporation paid all the premiums on this policy.Shortly thereafter, on April 23, 1975, Dr. Benham gratuitously assigned the Manhattan policy to Mrs. Benham. The second insurance policy involved in this case is a Home Life Insurance Company of New York (Home Life) policy initially purchased on March 1, 1972, by the profit-sharing plan that had been established by the corporation. The face value of the Home Life policy was $145,409, and annual premiums were $5,574.98 per year. The corporation's earnings for the fiscal year ending January 31, 1974, were *453 significantly lower than projected. Mr. Telchin believed that the plan's qualification under section 401 would have been lost if it had paid the entire annual premium since $5,574.98 was in excess of 49.9 percent of the amount contributed by the corporation to the profit-sharing plan in its fiscal year ending January 31, 1975. At a January 29, 1975, meeting attended by Dr. Benham, Mrs. Benham, Mr. Telchin, William Beale, the corporation's accountant, and Byron Prusky and Fred Savadove, attorneys for the corporation, the decision was made to follow Mr. Telchin's recommendation and to have the corporation dispose of ownership of the Home Life policy. Mr. Telchin suggested that the policy be transferred to Mrs. Benham, but that the transfer not be direct because of the belief that a direct transfer to her would have been a prohibited transaction triggering tax liability under section 4975. Mr. Prusky agreed with this advice. The record is unclear whether the reasons for choosing Mrs. Benham as the owner of the policy were fully explained to Dr. Benham by his advisors. He and his corporation may have simply followed their advice. The advisors' proposal was carried out soon after *454 the meeting. In February 1975 the profit-sharing plan sold the Home Life policy to decedent in exchange for cash equal to the policy's cash surrender value. On March 8, 1975, Dr. Benham gratuitously transferred ownership of the Home Life policy to Mrs. Benham. After the transfer, Mrs. Benham, as owner of the policy, borrowed against the policy's cash value to fund the payment of premiums from the time of transfer until the date of Dr. Benham's death. Upon Dr. Benham's death, Mrs. Benham received $131,733.38 as the proceeds of the Home Life policy and $200,000 (exclusive of interest) as the proceeds of the Manhattan policy, representing $100,000 of life insurance plus an additional $100,000 of accidental death benefits. These amounts were excluded in computing the value of the gross estate reported on decedent's Federal estate tax return. Respondent determined that these amounts should have been included in the gross estate because he viewed the transfer of ownership of the policies from Dr. Benham to his wife as transfers in contemplation of death. ULTIMATE FINDINGS OF FACT Dr. Benham's transfers to his wife of the Manhattan group term life insurance and accidental death *455 policy and of the Home Life whole life insurance policy were not made in contemplation of death. OPINION We must decide here whether decedent was motivated by the contemplation of death in gratuitously assigning ownership of life insurance policies to his wife. Two life insurance policies are involved here. One was a group term policy purchased by the professional corporation owned by Dr. Benham, which he transferred to his wife soon after he received ownership of the policy. The second policy in controversy here is a whole life insurance policy, which was sold by the profit-sharing plan of the corporation to decedent and was soon thereafter transferred by him to his wife. Because the assignments of both the group term policy (the Manhattan policy) and the whole life policy (Home Life policy) were made within three years of the date of decedent's death, under section 2035(b), as in effect when decedent died in 1977, there is a rebuttable presumption that the transfers were made in contemplation of death. The purpose of section 2035 is "to reach substitutes for testamentary dispositions and thus to prevent the evasion of the estate tax." United States v. Wells,283 U.S. 102, 117 (1931). *456 Section 20.2035-1(c), Estate Tax Regs., provides that a transfer is in contemplation of death if "(1) made with the purpose of avoiding death taxes, (2) made as a substitute for a testamentary disposition of the property, or (3) made for any other motive associated with death." The crucial question is one of fact--whether in light of all circumstances the dominant motive in making the assignment was the thought of death or a purpose normally associated with life. United States v. Wells,supra;Estate of Honickman v. Commissioner,58 T.C. 132, 135 (1972), affd. without opinion 481 F.2d 1399 (3d Cir. 1973); Estate of Gerard v. Commissioner,57 T.C. 749, 758 (1972), affd. per curiam 513 F.2d 1232 (2d Cir. 1975). The burden is on petitioner to establish that the transfer of the policies was predominately motivated by life-associated factors. Estate of Awrey v. Commissioner,5 T.C. 222, 240 (1945). This burden is particularly heavy if the property transferred is so inherently death oriented *457 as life insurance. Peters v. United States,216 Ct.Cl. 134, 139, 572 F.2d 851, 854 (1978); Estate of Compton v. Commissioner,532 F.2d 1086, 1088 (6th Cir. 1976), affg. a Memorandum Opinion of this Court; Berman v. United States,487 F.2d 70, 72 (5th Cir. 1973). The burden is heavier still with respect to term life insurance with no cash surrender or loan value. Hope v. United States,691 F.2d 786, 791 (5th Cir. 1982); Peters v. United States,supra at 854. There is substantial evidence in the record which necessitates viewing this case as closer to decisions in which life motives have been found [2] than to those decisions in which such motives have not been accepted as dominant. We have concluded on the particular facts presented here that Dr. Benham was not motivated by the thought of death when he made the transfers at issue here. The fact that Dr. Benham *458 was not in fear of imminent death at the time the assignment was made is not controlling. But the fact that he was in excellent health and not of an advanced age are factors to be weighed in petitioners' favor. See Estate of Ford v. Commissioner,53 T.C. 114, 123 (1969). Moreover, petitioners have presented specific explanations for why the policies were transferred by Dr. Benham to his wife, which negate any presumption of the transfers having been made in contemplation of death. We look first at the assignment to Mrs. Benham of the Home Life policy that was initially owned by the profit-sharing plan of the professional corporation owned by Dr. Benham. The evidence in the record is clear that the policy was transferred out of the plan because of a desire to assure the plan's continued qualification under section 401. This is a life-associated motive. The testimony of the attorney and insurance advisor for the corporation and the Benhams establishes that it was the specific intention of the corporation and its profit-sharing trust to transfer the policy to Mrs. Benham. Choosing Mrs. Benham as the transferee was reasonable in view of the fact that most of the *459 insurance held by the profit-sharing trust had replaced prior policies owned by Mrs. Benham. Only because of the advisors' concern that a direct transfer of the policy to Mrs. Benham would be a prohibited transaction triggering application of the excise tax imposed by section 4975 was the transfer not made directly to her. To avoid the section 4975 tax, the transfer was designed to consist of two stages: (1) from the profit-sharing trust to Dr. Benham, and (2) from Dr. Benham to his wife. Dr. Benham owned the policy only for the brief period of time needed to effectuate the ultimate transfer of ownership to Mrs. Benham. We believe the two transfers must be analyzed together because they were only steps in an integrated plan to effectuate the ultimate transfer of the Home Life policy from the profit-sharing trust to Mrs. Benham. [3] On these facts, we do not believe it is necessary for petitioners to prove a separate life-associated motive for the transfer from Dr. Benham to his wife. This second step was not independent and should not be analyzed in isolation from the entire scheme for the transfer of ownership. See Security Industrial Insurance Company v. United States, *460     F.2d     (5th Cir., April 22, 1983, 51 AFTR 2d 83-   , 83-1 USTC par. 9320), for a discussion of tests used in applying the step transaction doctrine when analyzing corporate reorganizations. We have a similar situation with respect to the Manhattan term life insurance and accidental death policy. The Manhattan policy was specifically designed to replace an existing policy (the NAPC policy), which had been owned by Mrs. Benham for several years. Although providing somewhat better coverage for the same price, we believe the Manhattan policy was similar enough to the NAPC policy so that it should be treated as a replacement for the existing policy. Certainly, the record indicates that it was presented to the Benhams and the corporation by their insurance advisor as merely a replacement, and that *461 they acted on this basis. The reason the Manhattan policy was acquired by the corporation for the benefit of Mrs. Benham was simply to get a better deal for the money. We believe this should be considered a life-oriented motivation. The record further establishes that Mrs. Benham would have been named the owner of the policy as soon as it was purchased by the corporation if that had been permitted by Manhattan.Again, the only reason Dr. Benham became an owner of the policy was to effectuate the ultimate transfer of ownership to Mrs. Benham. His ownership and transfer of the policy was only one step in the integrated plan for the corporation to acquire the Manhattan policy and to have ownership of it transferred to Mrs. Benham so that she could replace the NAPC policy she currently owned. Therefore, we do not believe the transfer from Dr. Benham to his wife of the Manhattan policy should be analyzed in isolation from the other steps in the purchase and transfer of this policy. We hold that petitioners have carried their burden of proof in establishing that decedent's ownership and transfer to his wife of the policies involved here was not motivated by thoughts of death.Thus, *462 we hold that section 2035 does not require the proceeds of these policies to be included in the decedent's gross estate. Decision will be entered for the petitioners.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the year in issue.↩
2. E.g., Landorf v. United States,187 Ct.Cl. 99, 408 F.2d 461 (1969); Estate of Carlstrom v. Commissioner,76 T.C. 142 (1981); Estate of Wasserman v. Commissioner,T.C. Memo. 1982-271↩.
3. Cf. Allen v. Trust Company of Georgia,326 U.S. 630↩ (1946), in which the Supreme Court found that a settlor's life-associated motive in establishing trusts several years earlier was determinative as to his motive in releasing, within two years of his death, powers to amend the trusts, which he had reserved when he created the trusts.