ESTATE OF JAMES P. GREEN, Deceased, GLADYS A. GREEN, Executrix, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
ESTATE OF GREEN v. COMMISSIONER
Docket No. 18993-82.
United States Tax Court
T.C. Memo 1986-511; 1986 Tax Ct. Memo LEXIS 87; 52 T.C.M. (CCH) 800; October 20, 1986. *87 Decedent made gifts to his wife on Dec. 27, 1976, which was within 3 years of his death. The Commissioner determined that those gifts were made in contemplation of death and were includable in decedent's estate under sec. 2035, I.R.C. 1954. Held, such gifts were substitutes for testamentary transfers, were made to avoid the estate tax, and consequently, were made in contemplation of death within the meaning of sec. 2035. Robert K. Dowd, for the petitioner. James W. Lessis, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined a deficiency of $15,692.12 in the petitioner's estate tax. The issue for decision is whether gifts made by the decedent within 3 years before his death were made in contemplation of death within the meaning of section 2035 of the Internal Revenue Code of 1954. [1]
FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The decedent, James P. Green, died on September 11, 1978. The executrix of his estate, Gladys A. Green, resided in Dallas, Texas, at the time the petition was filed in this case. The Federal estate tax return for the estate was filed with the Internal Revenue Service Center in Austin, Texas. The decedent was born in Texas in 1902. He married Gladys Abel in *89 Abilene, Texas, on November 24, 1926. The decedent worked as a purchasing agent and estimator on construction projects. His wife was employed as a bookkeeper and part-time secretary. Shortly after their marriage, Mr. and Mrs. Green moved to El Paso where they lived until the early 1950s. At that time, they moved to Dallas. Mr. Green retired in 1960, and in 1961, the Greens moved to their ranch in Denton County, Texas, where they hoped to establish a successful commercial ranching operation. Unfortunately, the operation proved to be unprofitable, and the Greens were forced to borrow money to meet their living expenses. At the suggestion of their attorney, William E. Johnson, Jr., they decided to sell the ranch and return to Dallas. On August 13, 1973, Mr. and Mrs. Green jointly conveyed their ranch, consisting of approximately 400 acres of land, to William E. Campbell, Jr., in exchange for approximately $148,000.00 in cash and a nonrecourse promissory note in the amount of $569,289.20. The note called for interest payments to be made each year beginning in 1974 and for annual principal payments to be made beginning in 1982. In 1975 and 1976, Mr. Campbell failed to pay the *90 required installments under the note. In both of these years, the Greens made a demand for payment and threatened to bring foreclosure proceedings if Mr. Campbell failed to meet his obligation. After each demand, Mr. Campbell made payments under the note sufficient to avoid foreclosure. In 1977, Mr. Campbell again failed to make a required interest payment on the note. The Greens again made a demand for payment. When Mr. Campbell failed to respond to the demand, the Greens elected to place the property for sale. In an attempt to resolve their differences and to avoid foreclosure, the Greens and Mr. Campbell revised the terms of the promissory note on October 6, 1977. As a result of the agreement, Mr. Campbell made a payment of $30,000, and the outstanding principal balance of the note was reduced to $375,519.40. In exchange, he agreed to become personally liable for the principal balance of the note in excess of $300,415.52. The proceeds from the sale of the ranch received in 1973 offered the Greens their first opportunity to embark on an investment program. They established an investment account with their attorney, Mr. Johnson, and invested in commercial paper and in *91 common stock. While no investment was made without the approval of the Greens, Mr. Johnson maintained the account and executed the investment decisions on their behalf. In 1973, the decedent began to make a series of small gifts to his wife. On December 10, 1973, he directed Mr. Johnson by letter to transfer $3,000 from the investment account, which was community property, to Mrs. Green's separate account. This practice was repeated on December 9, 1974, December 8, 1975, and December 6, 1976. On November 22, 1975, the Greens each executed their wills. The decedent devised his entire estate to his wife outright, on the condition that she survive him for at least 30 days.He named his wife as executrix of the estate. On the other hand, Mrs. Green devised her entire estate to a trustee who was to distribute the income of the trust for the benefit of Mr. Green, if he survived her. Her will recited that the estate property was not given outright to Mr. Green "because of his present severe illness and probable future disability." The will named Mr. Johnson as executor of her estate. The Greens celebrated their 50th wedding anniversary on November 24, 1976, which was the day before *92 Thanksgiving. At some time thereafter, Mr. Green expressed in a telephone conversation with Mr. Johnson the wish to make additional gifts to his wife. On December 6, 1976, Mr. Johnson wrote to the Greens and advised them that a gift completed before the end of 1976 could save estate taxes "down the line." [2] The letter estimated that a gift of $125,000 could achieve a total gift and estate tax saving of over $18,000. The letter went on to state that even if Mr. Green were to die within 3 years of the transfer and if the property were to be included in the estate under section 2035, the gift tax paid upon transfer would still reduce the size of the estate and would serve as a credit against any estate tax liability. The letter contained no reference to the Greens' wedding anniversary and no indication that it was prepared in response to a request or direction by Mr. Green. *93 Mr. Johnson sent a copy of his letter to the Greens' accountant and invited his comments on the proposal. In the letter to the accountant, Mr. Johnson observed, "It seems to me that if we have a good possibility of reducing the total gift and estate taxes which may be anticipated we will be performing a real service to * * * [the Greens] as well." In another letter to the Greens on December 11, 1976, concerning their investments, Mr. Johnson reported that he had not yet heard from the accountant. In time, Mr. Johnson prepared the necessary documents for Mr. Green to make the gifts to Mrs. Green. On December 27, 1976, the Greens' principal assets were the promissory note from Mr. Campbell, which then had a principal balance of $515,577.20, and the investment account, which then was worth $41,000.00. Since both assets were community property, Mr. Green's share amounted to $257,788.60 in the promissory note and $20,500.00 in the investment account. In a letter dated December 27, 1976, Mr. Green directed Mr. Johnson to segregate $17,500.00 in the investment account as his wife's separate property. On the same day, he conveyed $100,000.00 of his interest in the promissory note to *94 his wife. On January 2, 1977, Mr. Green made one final gift to his wife of his remaining interest in the investment account, which amounted to $3,000.00. In an affidavit given by Mr. Johnson in 1979, he said, in part, The motivation for such consistent annual giving, including the extraordinary gifts of 1976, was to affiant's knowledge as aforesaid living recognition and appreciation for the untiring efforts of Mrs. Gladys A. Green in the operation and improvement of their farm and ranch and such gifts were not made in contemplation of death. However, elsewhere he said: In the year 1976, with the passage by Congress of the 1976 Tax Reform Act and the once-in-a-lifetime opportunity to avail himself of the benefits to be derived therefrom, at affiant's instance and recommendation, the said James P. Green made a substantial gift to his spouse in that year consisting of $20,500.00 in cash and a $100,000.00 separate property interest in a Promissory Note; * * * In the early 1970s, Mr. Green's medical condition began to deteriorate. In 1972, he was involved in a minor automobile accident. He suffered no serious injuries from the accident, but he became nervous and occasionally *95 confused and disoriented. He never thereafter drove the automobile, and he never thereafter went out without Mrs. Green. By October 1973, his physical and mental condition had worsened, and he was admitted to the hospital. He was diagnosed as having central nervous system syndrome, a slowly deteriorating disorder of the central nervous system, now known as Alzheimer's disease. This illness is typically characterized by gradual loss of memory and progressive helplessness. While his health appeared to improve at times, his condition slowly deteriorated over the years. Mr. Green's doctor advised him to "simplify his life" and believed that transferring the management of business matters was consistent with that advice. In October 1976, Mr. Green was treated in an emergency room for an inguinal hernia. The hernia was painful and made him uncomfortable, but it was not considered life-threatening. In the summer of 1978, Mr. Green's central nervous system disorder was so advanced that he became incapacitated. His wife was forced to care for him at home. In September 1978, he entered the hospital for the last time. He was 75 years old at the time of his death. In the notice *96 of deficiency, the Commissioner determined that "the transfers of cash in the amount of $20,500 and an undivided $100,000 interest in a note receivable made by the decedent to his wife, Gladys A. Green, on December 27, 1976, were made by the decedent in contemplation of death and are includable in the gross estate under section 2035 of the Internal Revenue Code." [3]
In winding up its affairs, the estate paid the Texas Comptroller of Public Accounts $1,846.50 for Texas inheritance taxes. The Commissioner reflected *97 this payment in his notice of deficiency by allowing the petitioner a credit under section 2011 of $1,334.41 for State death taxes paid. At the time the notice of deficiency was issued, the entire payment for Texas inheritance taxes had in fact been refunded to the petitioner. Upon receiving notice of this refund, the Commissioner amended his answer to disallow the credit reflected in the notice of deficiency. The petitioner now agrees that it has not actually paid any estate or inheritance taxes to any State or to the District of Columbia with respect to any property included within the decedent's estate and has conceded such issue. OPINION We must decide whether the gifts made by the decedent to his wife on December 27, 1976, were transfers made in contemplation of death within the meaning of section 2035. As in effect for transfers made before January 1, 1977, section 2035(a) provided that the value of a decedent's gross estate included "the value of all property * * * of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), * * * in contemplation of his death." At that time, *98 section 2035(b) provided in part: If the decedent within a period of 3 years ending with the date of his death (except in case of a bona fide sale for an adequate and full consideration in money or money's worth) transferred an interest in property, * * * such transfer, * * * shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this section * * *. Section 2035 was intended to "reach substitutes for testamentary dispositions and thus to prevent evasion of the estate tax." United States v. Wells,283 U.S. 102, 117 (1931). As it existed at the time of the gifts made by the decedent, section 2035(b) created a rebuttable presumption that transfers made within 3 years before death were made in contemplation of death. Estate of Himmelstein v. Commissioner,73 T.C. 868, 871 (1980). Thus, the burden is on the petitioner to prove that such transfers by the decedent were not in contemplation of death. Estate of Gerard v. Commissioner,57 T.C. 749, 757 (1972), affd. per curiam 513 F.2d 1232 (2d Cir. 1975). To prevail on this issue, the petitioner must show that the *99 decedent's dominant motive for making the transfers, as determined from all the facts and circumstances, centered on a purpose associated with life and not on the thought of impending death. United States v. Wells,283 U.S. at 118; Estate of Gerard v. Commissioner,57 T.C. at 758. In Estate of Johnson v. Commissioner,10 T.C. 680, 688-689 (1948), this Court stated that the factors to be considered in determining the dominant motive of a decedent in making an inter vivos transfer of property include: (1) The age of the decedent at the time of the transfers; (2) the state of the decedent's health, as he knew it, at or before the time of the transfers; (3) the amount of property transferred in proportion to the amount of property retained; (4) the existence of a general testamentary scheme, of which the transfers were a part; (5) the relationship of the donee to the decedent, including whether the donee was the natural object of the decedent's bounty; (6) the existence of a long established gift-making policy on the part of the decedent; (7) the existence of a desire on the part of the decedent to escape the burden of managing property *100 by transferring the property to others; and (8) the existence of a desire on the part of the decedent to avoid estate taxes by means of making inter vivos transfers of property. After careful consideration of all the evidence presented, we find that the gifts made by Mr. Green to his wife on December 27, 1976, were transfers made in contemplation of death and are therefore includable within his estate under section 2035. Our conclusion is based upon an examination of the facts of this case in light of the factors announced in Estate of Johnson v. Commissioner,supra.
At the time of the transfers at issue, Mr. Green was 74 years old. While his age, by itself, is not dispositive, it tends to support a finding that his motives for making the gifts were not associated with life. See Estate of Russell v. Commissioner,70 T.C. 40, 45 (1978); Estate of Hite v. Commissioner,49 T.C. 580, 598 (1968). The petitioner argues that gifts by individuals much older than the decedent have been held not to have been made in contemplated of death. In particular, it relies on Kniskern v. United States,232 F. Supp. 7 (S.D. Fla. 1964), *101 in which the district court found that gifts made by a 99-year-old man were made for purposes associated with life. However, the facts in Kniskern show a physically and mentally active man, filled with extraordinary vitality and a zest for living. Such is not the case with Mr. Green. Mr. Green's health was poor at the time of the transfers. He suffered from a painful inguinal hernia and had been diagnosed as having central nervous system syndrome, which is characterized by general physical and mental deterioration. While his health appeared to improve at times, his condition slowly worsened over a period of years. He ultimately died from this illness. The record does not indicate whether the decedent actually knew the extent of his physical and mental deterioration. However, it does portray an elderly man who found the tasks of everyday living to be increasingly difficult. It is reasonable to infer that he knew that he would never regain his health. The gifts made on December 27, 1976, constituted a large percentage of Mr. Green's property on that date. His assets consisted of an interest (which amounted to $257,788.60 based on the outstanding principal balance) in *102 the promissory note from Mr. Campbell and a $20,500.00 interest in the investment account. The gifts amounted to $117,500.00. Thus, he transferred over 42 percent of his property at that time. Mr. Green made the gifts to his wife, who was the natural object of his bounty and the sole beneficiary of his estate under his will. The gifts merely accelerated the transfer of the property to Mrs. Green, who would have received the property anyway upon his death. The gifts were not in keeping with the decedent's established gift-making policy. The petitioner is correct in pointing out that Mr. Green had made a series of gifts of $3,000 each year to his wife; but the transfers at issue are almost 40 times as large as those earlier gifts. The December 27, 1976, gifts can only be regarded as aberrations and not as part of his gift-making program. The evidence does not support a conclusion that the decedent made the gifts so that he could escape the burden of managing the property. The assets in the investment account were managed by Mr. Green's attorney; the attorney selected the investments and carried out the investment decisions. The decedent was only occasionally "burdened" with *103 managing these assets, and then only to discuss and approve the investment choices made by his attorney. On the other hand, collecting on the promissory note was a more troublesome management task. Mr. Campbell proved to be a recalcitrant debtor who was forever behind on the payments required under the note. Transferring ownership of the note would undoubtedly have simplified Mr. Green's life. However, he made a gift of only a portion of his interest in the note. After the gift, he still retained an interest of $157,788.60.This amount represented almost 31 percent of its principal balance. If the decedent had a genuine desire to escape the problems with Mr. Campbell, he would have, at the minimum, transferred his entire community interest, and if he really wanted to be free of the problems, he would have joined his wife in transferring the entire note to a third person for collection. The final Johnson factor concerns a desire by the decedent to avoid estate taxes by making inter vivos transfers of property. While Mr. Green may have been moved by the occasion of his 50th wedding anniversary to make some additional gifts to his wife, it was his attorney who pointed out the *104 tax benefits of making a gift of $125,000 before January 1, 1977. The attorney calculated that the decedent could save over $18,000 in combined estate and gift taxes by such a transfer. [4] The fact that a gift of $117,500 was made only 5 days before the unfavorable provisions of the Tax Reform Act of 1976 took effect strongly supports a conclusion that the gifts were made to avoid estate taxes. See Estate of Shoemaker v. Commissioner,T.C. Memo. 1984-174; Estate of Hutchinson v. Commissioner,T.C. Memo. 1984-55, affd. 765 F.2d 665 (7th Cir. 1985). The petitioner vigorously argues that the gifts at issue were made by Mr. Green in recognition of his 50th wedding anniversary. Both Mr. Johnson and Mrs. Green testified that Mr. Green called Mr. Johnson and expressed his wish to make an extraordinary gift to his wife. Both witnesses thought that the call was made on November 29, 1976, and that Mr. Green suggested the amount of the gift to be $100,000. However, we were not convinced that their testimony was altogether *105 accurate. The first record that we have concerning the gifts is Mr. Johnson's letter of December 6, 1976, when he proposed that Mr. Green make a gift of $125,000. That letter contained no indication that it was in response to an earlier telephone conversation with Mr. Green, and nothing was said about the Greens' wedding anniversary; instead, the gift was suggested to save taxes "down the line." On the same day, Mr. Johnson wrote to the Greens' accountant indicating that the purpose of the proposed gift was to save taxes. In a letter dated December 11, 1976, Mr. Johnson indicated that the amount of the gift had not yet been settled. We find the written statements made by Mr. Johnson in December 1976 to be far more persuasive evidence of the reasons for the gift than his recollection of the circumstances at trial in 1985. No doubt there were telephone conversations between Mr. Green and Mr. Johnson at some time during that month, and no doubt Mr. Green agreed to Mr. Johnson's suggestion to make a large gift to Mrs. Green because of Mr. Green's affection toward her and because of their 50th anniversary. However, the documentary evidence indicates that the gifts of $117,500 grew *106 out of the suggestion by Mr. Johnson on December 6, 1976, and that they were made to save taxes. In addition, in 1979, when Mr. Johnson's memory of the circumstances would surely be better than in 1985, he stated that the gifts were made as a result of his recommendation to save taxes, although he also claimed that they were made for reasons of love and affection. At the trial, Mrs. Green even admitted that the gifts were made to get the money out of Mr. Green's estate. On this record, we are convinced that the dominant reason for making the gifts of $117,500 was to save estate taxes. For these reasons, we hold that the gifts were made in contemplation of death and are therefore includable in the decedent's estate under section 2035. Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect during the year in issue.↩
2. The Tax Reform Act of 1976 made several changes which reduced the tax benefit of making inter vivos transfers of property after Dec. 31, 1976. First, it changed sec. 2035 to require that all transfers made within 3 years before death be included in the decedent's estate; in effect, it eliminated the opportunity for an estate to rebut the presumption that such transfers were made in contemplation of death. See Tax Reform Act of 1976, Pub. L. No. 94-455, sec. 2001(a)(5), 90 Stat. 1520, 1848. In addition, the Act unified the estate and gift taxes, so that all of an individual's assets, whether transferred during a decedent's lifetime or retained until his death, are taxed as a single unit. Tax Reform Act of 1976, supra,sec. 2001(a)(1), 90 Stat. 1846; see also Internal Revenue Code sec. 2001↩.
3. In fact, Mr. Green transferred to Mrs. Green, on Dec. 27, 1976, only the $100,000 interest in the note and $17,500 in cash. However, the petitioner never raised an issue concerning this error in the notice of deficiency, and such error is not prejudicial to the petitioner. If the petitioner had objected, the Commissioner could have claimed that the $3,000 gift on Jan. 2, 1977, was includable in the estate, or he could even have claimed that the $3,000 gift on Dec. 6, 1976, was includable in the estate.Had the Commissioner raised the issue, it is clear that the gift on Jan. 2, 1977, would be includable in the estate. See fn. 2, infra.↩
4. This tax saving was largely attributable to the fact that the estate and gift taxes were not unified before 1977.↩